John D. Bennett, S.
This discovery proceeding involves the question whether the estate of Joseph P. Grace has jany right, title or interest in and to a certain biography of the late William B. Grace, the father of the decedent, and if so, the extent, but not the value, thereof. The author was Marquis J ames and the title has been referred to in the evidence here as ‘ ‘ The Merchant Adventurer ” or simply “ The Life of W. R. Grace ”.
Joseph P. Grace died on July 15, 1950 leaving a will dated October 27, 1947. There is no mention in the will of any such *1065 biography and two of the executors administering the estate do not include that biography or any interest therein as an asset of the estate in the various accounts filed by them. W. R. Grace & Co. asserts that it has sole and exclusive ownership thereof.
Obviously, if the biography is an asset the executors have a duty to list it as such and to determine its fair and reasonable market value, if any; and W. R. Grace & Co. has a duty to share it and not withhold it from the estate. The court has limited the proof at this stage of the proceedings to the nature and extent of the decedent’s interest therein. Determination of the value, if that is necessary, will be postponed for additional proceedings on the settlement of the account now pending.
This discovery proceeding was instituted by one of the three executors against the respondent W. R. Grace & Co. (hereinafter referred to as the “ company ”) alleging in substance that the manuscript in question is in the possession of the company under an adverse claim of title. The answer of the company asserts that by virtue of certain letter-agreements and assignments annexed to the answer, it (the company) is “ vested in [sic] all right, title and interest to the Marquis James manuscript referred to ” in the petition.
William R. Grace was well known as a tycoon of American industry, having founded several institutions and a steamship company, and he had also been Mayor of the City of New York in 1881/82 and 1885/86 (“Who Was Who in America” 1897-1942, Vol. 1, p. 474). The decedent here ultimately succeeded to his father’s position at the helm of the Grace enterprises. The chairman of the board of directors of the company in October, 1944 was a Mr. Iglehart, and in December, 1944 the chairman was Joseph P. Grace (our decedent). Documents attached to the company’s answer (later received in evidence) indicate that there had been “ conversations and correspondence ” between the company, on the one hand, and Marquis James, on the other, with respect to a proposed biography to be written by James covering the life of the late William R. Grace. One is a letter dated October 11,1944 to Marquis James written by the president of the company and purports to set forth the terms upon which Mr. James was to write the biography. It sets forth various details regarding the research to be done in writing the book; mentions installment payments to be made to Mr. James or his nominee totaling $62,500, plus expenses up to $12,500. This letter states that: “ Upon completion, the literary property therein, together with all revenue-producing rights of every nature, shall be owned half by us and half by you. No author’s royalties shall be payable and all profits shall *1066 he divided equally after defraying the expenses of printing, publishing, and selling the book.” (Emphasis supplied.) The letter, after providing for the payments afore-mentioned, states further: “ If, upon completion of the work, we should reach the conclusion not to have it published, we will pay you the additional sum of $12,500 and upon such payment you will assign us all of your rights, title and interest in and to the literary property, including all revenue-producing rights.” (Emphasis supplied.)
There followed a letter dated October 13,1944 by which author James replied to Mr. Iglehart, confirming that the letter of October 11 was in accord with previous correspondence with one ‘ ‘ exception ’ ’, concerning minor details not here relevant.
The court has not been shown any further correspondence until a letter dated December 28,1944 addressed to the company by the decedent, Joseph P. Grace. It refers to the company’s agreement with the author and states: 1 ‘ I wish to confirm the understanding between us at the time when you entered into such agreement that I was to have a fifty per cent interest therein and was to share fifty per cent of the expenses thereof. Pursuant to our understanding, I am to pay to you one-half of any amounts paid by you to or at the direction of Mr. James, and also one-half of any expenses incurred by you either in the writing or publication of the book.
“ TJpon completion of the book, Mr. James is to own a one-half interest, you are to own a one-fourth interest and I am to own a one-fourth interest in the literary property therein and in all revenue producing rights of every nature connected therewith. Net profits derived from the sale of the book and from the sale of any revenue producing rights therein shall be divided between us on the basis of the foregoing percentages.” Subscribed to this is the statement: 1 ‘ Agreed: W. R. Grace & Co., By W. F. Cogswell.” (Emphasis supplied.)
Thereafter the author proceeded with his research and other writing tasks and completed a manuscript of the biography. This manuscript was not offered in evidence, but pursuant to subpoena the company produced and exhibited to the court a wrapped package presumably containing the manuscript.
Produced by the company during the hearing and marked as exhibits for identification were three file folders of papers. These files were not shown to have been kept in the regular course of the company’s business and the contents therefore were not examined by the court, except for the certain specific items marked in evidence. However, it does appear by appropriate evidence that the company made the required payments *1067 to the author. The total payments charged to the decedent amounted to about $38,000, although it appears that he was not charged by the company with any expenses incurred after 1947.
While the decedent appears at one time to have been the guiding light of the company, the testimony was that he did not have an active participation during the year 1948. In the absence of proof to the contrary it is reasonable to assume that he was not active in the company from 1947 to his death in July, 1950. However, in 1948 a ‘ ‘ decision ’ ’ was made by the ‘1 management ” to “ postpone ” publication of the manuscript to the fall of 1950 and again in 1952 a ‘1 decision ’ ’ not to publish was made. This was according to the testimony of the present executive vice-president of the company who is also a director, having assumed the latter office in 1946. He became vice-president in 1939, first vice-president in 1951 and executive vice-president in 1955. He testified that the decision to postpone was made by a “committee” and “reported” to the board of directors of the company; that the question was again reviewed in 1952 by the same or a similar committee and that this group, on behalf of the company “ decided finally not to publish the book. ’ ’
It appears that Joseph P. Grace, Jr., then and now one of the executors of this estate, was also president of the respondent company in 1952, and was also a member of the “ committee ” referred to in the afore-mentioned testimony. The same witness mentioned above testified that there was no attempt in 1952 to contact any of the (other) representatives of the estate and that the company since then had considered itself to be the sole owner of the manuscript and the biography. He also testified that the question of publication has never been considered since the “final” decision in 1952, and that it was based on the assumption that publication would be “ injurious to the company’s interests.” However, this statement was contradicted by the company’s legal advisor who testified that their vice-president in charge of public relations as late as September, 1967 came to him to consult about the book and said: “ Well, I have an idea that it might be a good thing if we were to take this book and update it and publish it. 'Could we do it? ” To this he testified that he said: “ No, you can’t because if you do you’ll have to leave Marquis James’ name off it.”
It appears that the acts of the company and its officers with respect to the book in and subsequent to 1948 were not disclosed either to this decedent or to any representative of his estate after his death. Although one of the executors of this estate was at the same time an officer of the respondent corporation *1068 and a member of the committee that made the “ decisions ”, he neither appeared before the court in person nor did he testify. His acts on that committee, if any, must therefore be regarded as having been performed solely on behalf of the company and would not bind this estate because of his continuing conflict of interest. There is no proof, however, that such committee, the said executor, or the company itself ever acted in bad faith. In fact, the witness afore-mentioned testified that the committee “never had any idea” that the decedent’s estate had any interest in the manuscript and they assumed from the language of the first letter of October 11, 1944 that the company had an exclusive right to make the decision not to publish and to keep the manuscript in its vault.
It appears further that on March 10, 1948 the company and the author joined together in an agreement with a certain publishing company to publish the manuscript. There is no indication whatever that the decedent knew about such agreement or that it was brought to his attention. The express terms of the agreement, evidenced by the letters of 1944, provided that no author’s royalties were to be paid, but the agreement of 1948 nevertheless called for payment by the publisher of royalties to the author as well as to the company with no mention of any participation therein on the part of Joseph P. Grace. On September 8,1948 that agreement was amended to provide for postponement of the publication until the fall of 1950 and for other changes, including additional compensation to the publisher in the event of cancellation. The court draws no inferences at this time from these agreements of 1948 but has considered them as proof that the company acted as the manager of the enterprise and did not consider the interests of the decedent from that time on, particularly when it took the assignments later from author James and his wife.
Subsequent to the death of this, decedent, and possibly in accordance with the terms of the Í948 publishing agreement, the author and his wife executed assignments on January 17, 1952 which purported to transfer to the company alone all “ right, title and interest of whatsoever nature ” in and to the biography, ‘1 together with all literary and revenue producing rights therein, including * * * the sole and exclusive right to publish, copyright, adapt and change the said biography * * * provided, however, that if any adaption or change is hereafter made # # the name of said Marquis James as author shall not be used * * * without his consent.” (Emphasis supplied.)
*1069 It is argued by the company that the ‘ ‘ original agreement ’ ’ entered into in 1944 is clear and definite on its face, contains no ambiguity and requires no evidence to explain or clarify the terms agreed upon; that the author had an absolute right of ownership of the manuscript and an independent and separate right to publish or to make duplicates, the latter right having been acquired exclusively by the company. They say the sole right to publish or not to publish was acquired by the original agreement and also by virtue of the instruments of assignment. Expressing it another way, the company’s contention is that the decedent or his estate has only a contingent right to a one-fourth interest in the literary property if and when the manuscript is published, but has no property right or interest now because (1) the company has complete control by virtue of the assignments from the author and his wife; and (2) only the company has the right to decide whether or not to publish the work and it has made a decision not to publish.
The court takes a different view of the legal relationship of the parties. The court holds that the letters signed and approved by the company mentioned above, dated October 11, and December 28, 1944, particularly the language therein emphasized above, indicate that the author, the company and the decedent became joint venturers with a distinct understanding that all right, title and interest in the “literary” property as well as in the manuscript when completed would be owned by the three of them in the proportion (as originally arranged) of one half to the author and one fourth each to the decedent and to the company. Counsel for the company urges that the said two letters by themselves clearly express the contract between the parties, and that accordingly the court should make no reference to other written or oral communications. He urges, in effect, that the words “we” and “us” must be deemed to grant only to the company and not to the decedent the right to decide whether or not the work should be published, presumably because these pronouns were used in the October 11 letter, two months before the December letter was written by the decedent to the company.
The court finds no justification within the language of the October and December letters to indicate that the parties considered the words “we” and “ us ” as granting any exclusive rights to the company. Indeed, the October 11 letter itself refers to the “ conversations and correspondence which have passed between us ”, so that the later correspondence is merely confirmatory memoranda of the actual agreement and under *1070 standing previously reached. It is deemed essential therefore to give consideration to the prior documentary evidence in order to determine whether there was any expressed intention limiting the use of the pronouns or indicating an intention that the company exclusively would have the right to decide whether or not to publish.
It appears that the company’s legal department retained in its safe or other legal files some or all of the earlier correspondence. All of the letters have not been produced and the company has either been unable or did not see fit to offer any other proof in its own behalf. The court’s examination of the prior correspondence has therefore necessarily been limited to a consideration of Exhibits 11, 12, 13 and 14.
Exhibit 11 is the earliest correspondence submitted. This is a letter dated June 26,1944 and was written by Marquis James to the decedent. It describes the author’s understanding of the style of the book, the “primary message ”, the “dominant theme ”, and the author’s preference that it be a “ straight or pure biography”, pointing out that Mr. Grace was “ not trying to advertise the company” and wished to “show the enormous vitality that Mr. Grace infused into it and the accuracy of his vision.” The significance of this letter is that it shows the deep personal interest of the decedent and its several references to Mr. Iglehar.t. Incidentally, there is no mention in that letter regarding finances.
The next letter produced is Exhibit 12, dated July 18, 1944. This is addressed to Joseph P. Grace at Northeast Harbor, Maine. While it is an unsigned carbon copy, it was produced by the company and, in the absence' of other explanation, it is fair to assume that it was written by Mr Iglehart on behalf of the company. It refers to a letter from Marquis James as being ■attached and refers to “ the amount of fees ” as being “ rather higher than I had anticipated ”. It could not, therefore, refer to Mr. James ’ letter of June 26 and, of course, the court will not speculate as to the contents of the missing letter from Marquis James. This letter is somewhat significant as offering some light upon the use of the pronouns by the parties because it was addressed to the decedent and states, without reserving any special rights to the company, that “ when we get the manuscript we will be able to sell it to a publisher.” (Emphasis supplied). The copy in evidence indicates that there was a handwritten postscript thereon: “I think that it would be reasonable to charge % W R G & Co % Grace Line and % to you (if you insist).”
*1071 Exhibit 13 is a carbon copy of a letter dated July 21, (no year) addressed by “Joe” (the decedent) from Northeast Harbor, Maine, to ‘ ‘ Dear Igle ’ ’ thanking him for the letter from Marquis James, expressing his satisfaction and suggesting a change in the financial compensation to Mr. and Mrs. James instead of the amount and terms “originally suggested ”, namely, that they become ‘1 50% owners of the net proceeds of all the literary rights, such as those mentioned by Mr. James in his letter.” It also refers to the fact that “ Mr. James will be working on his own book ’till [sic] ’ ’.
Exhibit 14 appears to be a typewritten ribbon copy of a letter from Marquis James to “ Dear Mr. Iglehart ”, dated July 31, 1944, with a handwritten statement thereon: ‘ ‘ Original in safe, legal dept.” Its significance is that it expresses the author’s appreciation of “ the spirit of Mr. Grace’s letter, and (I) have a feeling we could work together a long while without a serious disagreement about anything.” It also refers to Mr. Grace’s suggestion that the author take a ‘ ‘ financial as well as a literary interest in the work proposed ”, and that it is “businesslike from his point of view.”
Although the earlier correspondence and the letters of October and December, 1944 appear to have been kept in the legal department safe used by the company, chief counsel for the company testified that he ‘1 never had the slightest idea that Mr. Joseph P. Grace had any interest in this property at all ” j that he at all times * ‘ considered it company property. ’ ’ Certainly the original agreement as made among the three men was not supervised by any attorney or the legal department of the company and it appears to have been arrived at in the form of many letters culminating in the one of December 28, 1944. The financial considerations involved and the task contemplated were quite large. True, the counsel for the respondent company testified that his legal department supervised later arrangements with the proposed publisher, but they clearly did so without reference to the legal relationships of the parties and disregarded completely the rights of Joseph P. Grace and his estate. Upon all of the facts shown, the conclusion of the court is that the three original parties to this enterprise and the agreement reached were the. author, the decedent and the company. The finding of the court is that, irrespective of any unilateral actions of the company, and irrespective of any further arrangements or agreements between and among the author, the company and any prospective publishers, none of the three original parties to this joint enterprise ever reserved to himself by mutual *1072 agreement any greater or special rights to the exclusion of the other two. If not partners, they were joint venturers in the agreed proportions and no change therein was ever made, so far as this record goes, with the knowledge or consent of Joseph P. Grace or his estate.
It is significant that the company and the decedent agreed to pay between them whatever remuneration and expenses would be due to the author or incurred in connection with the research and preparation of the manuscript; that a specific consideration was to be paid to the author and he was not to receive any royalties. His skill in research and literary ability was nevertheless to be contributed to bring the manuscript into being. The documentary evidence shows without contradiction or doubt whatever that they intended to include every ownership interest that might exist or arise from the manuscript and the publication or nonpublication thereof. The company has not claimed that Mr. Iglehart and W. F. Cogswell were not authorized to act for the company and their acts are deemed to have bound the company.
The case of Palmer v. De Witt (47 N. Y. 532) cited by the company is authority which favors a holding that title to the literary property vested in the decedent as well as in the company by virtue of the agreement contained in the letters. At page 538 of that opinion, it was held that: ‘1 This [literary] property in a manuscript is not distinguishable from any other personal property. It is governed by the same rules of transfer and succession ’ ’. Emphasizing the nature of such property, the court there held (pp. 539-540): “ The rights of assignees * * * have been sustained by the courts of this country, and no distinction has been made between transfers of literary property and property of any other description. * * *
“ The right of sale and transfer [before publication] is one of the inseparable incidents of property, and the property in a manuscript may be transferred, and upon the death of the owner goes to the personal representatives or next of kin of .the owner, as other personal property. A literary man realizes the product of his labor either by the sale of his manuscript or the publication and sale of his works. ’ ’
To the same effect is Stephens v. Cady (55 U. S. 528) and Pushman v. New York Graphic Soc. (287 N. Y. 302). The Pushman case expressly holds that an artist (or author) who sells his product without an express reservation of reproduction rights is deemed to have also transferred the so-called common-law copyright. That case and the authorities cited therein *1073 support a decision in this case to the effect that the author surrendered to both the decedent and the company whatever rights he had, including the “ literary ” property and the common-law copyright.
Stephens v. Cady (supra) concerned the single question whether or not the property acquired by the defendant at a sheriff’s sale (namely, a copperplate engraving of a map copyrighted under the Act of Congress) carried with it as an incident the right to print and publish the map engraved upon its face. It was there held that the copyright is a “ property in notion ’ ’ with no corporeal tangible substance, separate from the copperplate in that case (or the original manuscript in this). It was also held, however, that the copyright can be reached by a creditor’s bill in chancery and that an assignment can effectively be made of the copyright.
The situation here is unlike the lost Mark Twain manuscript dealt with in Chamberlain v. Feldman (274 App. Div. 515, affd. 300 N. Y. 135) cited by the company. In that case it was held that the common-law copyright or right of first publication belongs to the author and will be protected by the courts but not after it has been disposed of by him. In the case now before this court, it is clear that the author did dispose of his rights therein and agreed to share them on equal terms with the decedent and the company.
Under the above and other authorities, Marquis James had the right to assign whatever interest he had in this literary enterprise. That he did so and contributed all of his right, title and interest to the joint enterprise is clear from the documentary evidence and no proof has been introduced by the company either' that the author reserved any rights to himself or that the decedent surrendered his own proportionate share or any part thereof to the company or to the author. Neither was any proof introduced to show that there would be any basis for holding that the decedent or his estate should be estopped because of any act or omission on their part.
The company’s contention that it derived complete control and exclusive right to decide whether or not to publish as a result of the later assignments from the author and his wife is without substance. The proof is that the decedent was not alive at that time and, moreover, he did not participate actively in the affairs of the company in 1948 or thereafter. There is no showing that he acquiesced, consciously or otherwise, in any such claim on the company’s part. In the view this court takes of the rights of the parties, the company had no right to perform *1074 any act in derogation of the title of the decedent and his personal representatives. It was shown that the company had knowledge of bnt completely disregarded the interests of the decedent when it entered into new agreements with a proposed publisher and had galley proofs and other copies made of the manuscript after it had been completed. The company’s decision to postpone publication until the fall of 1950, and its settlement in 1952 with the publishing house and with Mr. and Mrs. James were entirely unilateral and not binding upon the decedent or his estate so far as this issue of title is concerned. The documents in evidence also show that the agreement with the publisher provided for ‘ ‘ royalties ” to be paid both to the author and to the company, based upon a percentage of the projected sales. This agreement was obviously not consistent with the understanding and agreement which had been arrived at in 1944 to the effect that no royalties were to be paid and that the parties were to share on the proportionate basis then agreed upon.
Having determined that the decedent and the company either became tenants in common as to their property rights or were joint venturers, it is clear that they owed to one another, while the enterprise continued, the duty of the highest fidelity and finest loyalty (Meinhard v. Salmon, 249 N. Y. 458, 463).
As to the special duty of the company as the ‘ ‘ managing co-adventurer ”, see Matter of Kohn (26 Misc 2d 659, 663, affd. 282 App. Div. 1045). The court accordingly concludes that the company had and now has no right to make any unilateral decision regarding the publication or nonpublication of the manuscript. To do so would come within the observation made in Meinhard v. Salmon (supra, p. 464) that: “ the pre-emptive privilege, or, better, the pre-emptive opportunity, that was thus an incident of the enterprise, [would be] appropriated to [it] self in secrecy and silence. ”
The company has to this day carefully preserved the manuscript in its vault and must consider it as having an important value, pecuniary or otherwise. At any rate, it is clear that any past or future decision against publication is revocable and can be changed. The company, therefore, cannot now be heard to say that it has made a permanent and binding decision not to publish.
Again paraphrasing the language of Judge Cardozo in Meinhard v. Salmon (supra, p. 464) to the “ eye of an observer ” the company appears to have held the biography as owner in its own right and for no one else, whereas in truth and in fact, the company holds it “as a fiduciary”, for itself and the *1075 decedent, “ sharers in a common venture.” See, also, Markowitz v. Markowitz (36 N. Y. S. 2d 261, affd. 265 App. Div. 993), where it was held that in dealing with common property a tenant in common is bound to defend the interests of all tenants or at least not to make any direct or indirect assault upon such interests, since there is a “ quasi trust relationship ” between them. (See, also, 86 C. J. S. Tenancy in Common, § 17.)
The petitioning executor appeared in person with his counsel during the hearings in this discovery proceeding. The other two executors were represented by a firm of attorneys who appeared for them and took a very active part in support of their position, against the estate, that the biography is owned by the company alone, and that it has no value. Since at least one of the latter executors has been an officer and director of the company and at least one took an active part as a member of the executive committee which discussed and considered this biography on behalf of the company, there is a conflict of interest. Their acts and proceedings in connection with this subject matter, however, will be dealt with in a separate decision in the accounting proceeding to which the company is not a party.
In the opinion of the court the estate is the owner of a one-half interest in the biography, including the literary property, the physical manuscript and the right to collect profits therefrom. There may arise a separate question which cannot be answered in this discovery proceeding as to whether the estate has any obligation to reimburse the company beyond the amounts paid by the decedent, or whether, on the contrary, the company may be financially obligated to the estate. These questions are reserved for and relegated to the accounting proceeding, without prejudice to the rights of the company to file whatever claim against the estate for contribution or otherwise that it may be advised to interpose. The executors are hereby directed to amend their account so as to include therein a one-half interest in the manuscript and the biographical work and W. R. Grace & Co. is hereby directed to produce and make the manuscript available for inspection by the executors and the guardian ad litem. The court also recommends that appropriate consideration be given to the possibility that future preservation of this asset might dictate further steps by way of securing proper copyrights.