Gray v. St. Martin's Press, Inc.    CV-95-285-M    03/28/96 P
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Robert K. Gray,
        Plaintiff,

        v.                                      Civil No. 95-285-M

St. Martin's Press, Inc.;
and Susan Trento,
        Defendants.


                            O R D E R


        Plaintiff, Robert Gray, sues defendants, Susan Trento and

St. Martin's Press, Inc. ("St. Martin's"), for defamation.

Trento now moves to dismiss Gray's complaint, Fed. R. Civ. P.

12(b)(2), on the ground that this court lacks personal

jurisdiction over her.  For the reasons discussed below, Trento's

motion is denied.


I.    **FACTUAL BACKGROUND**

        This suit arises out of statements contained in a book, The

Power House, Robert Keith Gray and the Selling of Access and

Influence in Washington ("The Power House"), which was authored

by Trento and published by St. Martin's in July 1992.  The book

contains at least eight passages that allegedly defame Gray by

portraying him as someone who improperly influenced national

politicians.  St. Martin's sold 30,817 copies of The Power House in the United States; 61 of those copies were sold to retailers in New Hampshire.

Trento, the author of The Power House, is a resident of the Commonwealth of Virginia.  She apparently has had no personal contact with New Hampshire relative to the book (excluding the book's distribution here).  Trento, of course, was aware prior to publication that St. Martin's was a national publisher and would be distributing the book on a national scale.

St. Martin's is a New York corporation which sells books nationwide and regularly distributes a substantial number of books in New Hampshire.  According to the standard "St. Martin's Press Contract" ("Contract") that formed the publishing agreement between Trento and St. Martin's, Trento granted St. Martin's the "sole and exclusive right to print, publish, distribute and sell" The Power House "throughout the world."  Contract ¶ 1(a).  The Contract further provides that all decisions as to "matters involving terms of sale, distribution, advertising and promotion of the Work shall be within the Publisher's sole discretion." Id. at ¶ 2(c).  In return for granting St. Martin's the right to publish her book, Trento received "[a] royalty at the rate of ten per cent (10%) of the list price on the first ten thousand

(10,000) copies sold [and] fifteen per cent (15%) of the list price on copies sold thereafter." Id. at ¶ 5(a)(i). The Contract is governed by New York law. Id. at ¶ 29.

Plaintiff Gray is a Florida resident. From 1954 to 1993 he was employed in Washington, D.C., first as a White House aide and later as a registered lobbyist. In 1956 and 1960 Gray spoke publicly in New Hampshire during its presidential primary election season, but his contacts with this state are generally insignificant.

## II.   STANDARD OF REVIEW

When a defendant moves to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of proving that jurisdiction lies in the forum state. Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995). In determining whether the plaintiff has met that burden, the court may utilize the "prima facia" method when, as here, the case does not involve incredible affidavits or material issues of credibility. Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145-46 (1st Cir. 1995); Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675-76 (1st Cir. 1992).

To make a prima facia showing, the plaintiff must go beyond the pleadings and "adduce evidence of specific facts." Foster-Miller, 46 F.3d at 145. Thus, the court draws "the facts from the pleadings and the parties supplementary filings, including affidavits, taking facts affirmatively alleged by plaintiff as true and construing disputed facts in the light most hospitable to plaintiff." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).

Rule 12(d), Fed. R. Civ. P., provides that the defense of lack of personal jurisdiction "shall be heard and determined before trial on application of any party, unless the court orders that the hearing and determination thereof be deferred until the trial." Id. If, before trial, the court denies the defendant's motion to dismiss, it is implicitly ordering that final determination of the propriety of personal jurisdiction be deferred until the trial. Boit, 967 F.2d at 676.

## III. DISCUSSION

### A. The New Hampshire Long-Arm Statute

In a diversity case, the district court's power to assert personal jurisdiction over a nonresident defendant is limited by the forum state's long-arm statute and the Due Process Clause of

4

the Fourteenth Amendment.  <u>Sawtelle</u>, 70 F.3d at 1387.  New Hampshire's long-arm statute permits the exercise of personal jurisdiction over a nonresident defendant who "in person or through an agent . . . commits a tortious act within this state . . . ."  N.H. Rev. Stat. Ann. § 510:4, I (1983).

The New Hampshire Supreme Court has interpreted this statute as authorizing the assertion of personal jurisdiction over nonresident tortfeasors to the full extent allowed by the Due Process Clause.  <u>Phelps v. Kingston</u>, 130 N.H. 166, 171, 536 A.2d 740, 742 (1987).  The First Circuit recently noted that "when a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards."  <u>Sawtelle</u>, 70 F.3d at 1388.  Thus, the constitutional inquiry alone determines whether the court may properly assert personal jurisdiction over Trento in this case.

### B.   The Due Process Clause

In order for the assertion of personal jurisdiction to comport with the Due Process Clause of the Fourteenth Amendment, certain "minimum contacts" must exist between the defendant and

the forum state.  <u>Sawtelle</u>, 70 F.3d at 1388 (quoting

<u>International Shoe Co. v. State of Washington</u>, 326 U.S. 310

(1945)).  This Circuit utilizes a three-part test in order to

determine if sufficient contacts exist to exercise specific[1]

personal jurisdiction:

> First, the claim underlying the litigation
> must directly arise out of, or relate to, the
> defendant's forum-state activities.  Second,
> the defendant's in-state contacts must
> represent a purposeful availment of the
> privilege of conducting activities in the
> forum state, thereby invoking the benefits
> and protections of that state's laws and
> making the defendant's involuntary presence
> before the state's courts foreseeable.
> Third, the exercise of jurisdiction must, in
> light of the Gestalt factors, be reasonable.

<u>Sawtelle</u>, 70 F.3d at 1389 (citations and quotations omitted).

Application of this tripartite test is fact sensitive - so much

so that the task of "[d]ivining personal jurisdiction is `more an

---

[1] The extent of the necessary jurisdictional showing varies depending upon whether the plaintiff asserts jurisdiction under a theory of "general" or "specific" jurisdiction.  <u>See</u> <u>Ticketmaster</u>, 26 F.3d at 204 n.3 (citing <u>Donatelli v. National Hockey League</u>, 893 F.2d 459, 462-63 (1st Cir. 1990)).  Here, as in <u>Ticketmaster</u>, "plaintiff's case stands or falls on a theory of specific jurisdiction."  <u>Id.</u>

art than a science.'" <u>Id.</u> at 1388 (quoting <u>Ticketmaster</u>, 26 F.3d at 206).

At each of the three steps, the court must analyze the contacts attributable to <u>each</u> individual defendant. <u>Sawtelle</u>, 70 F.3d at 1389. <u>See</u> <u>also</u> <u>Rush v. Savchuk</u>, 444 U.S. 320, 332 (1980) ("The requirements of <u>International Shoe</u> . . . must be met as to each defendant over whom a . . . court exercises jurisdiction."). Here, because only Trento, the author of <u>The Power House</u>, contests personal jurisdiction, the court must be careful to credit only those contacts legally attributable to her, and not those solely attributable to St. Martin's.

## 1.    Relatedness

Under the tripartite formula, the court must first consider whether Gray's claim arises out of, or relates to, Trento's in-forum activities. Gray contends that because the tort of libel is generally held to occur wherever the offending material is circulated, <u>see</u> <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 779 (1984), and copies of the allegedly libelous book were sold in New Hampshire, his claim relates to Trento's in-forum activities. Trento counters that St. Martin's, not she, distributed <u>The Power House</u> in New Hampshire, and, as a result,

St. Martin's, not she, conducted the in-forum activities to which Gray's suit relates.

In formulating its law of defamation, New Hampshire generally adheres to the rules set out in the Restatement (Second) of Torts. See, e.g., Independent Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 119, 635 A.2d 487, 492 (1993); Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 8, 549 A.2d 1187, 1188 (1988); Nash v. Keene Publishing Corp., 127 N.H. 214, 219, 498 A.2d 348, 351 (1985). Under certain circumstances, the Restatement assigns liability for harm caused by a third party's repetition of a defamatory statement to the party who originally published that statement.[2] Specifically, "[i]f the repetition is authorized or intended by the originator of the defamation, he is liable for the harmful effects of the actions of the person or persons to whom the authorized or intended repetition is made." Restatement (Second) of Torts § 576, cmt. c (1977) (emphasis added).

_____

[2] In the libel context, of course, "publication" simply means "communication intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577 (1977). Trento, therefore, published the allegedly defamatory statements to St. Martin's when she submitted her manuscript for The Power House.

8

Here, Trento authorized and intended, indeed contracted with St. Martin's for, the republication of her allegedly defamatory statements about Gray and is liable for the harmful effects of the republication. In that regard, this case is distinguishable from Ticketmaster, 26 F.3d at 206-07, relied upon heavily by Trento, in which the defendant, a reporter's source for a published newspaper story, made an allegedly defamatory statement in response to an unsolicited telephone interview.

"It is settled New Hampshire law that a party commits, for jurisdictional purposes, a tortious act within the state when injury occurs in New Hampshire . . . ." Hugel v. McNell, 886 F.2d 1, 3 (1st Cir. 1989), cert. denied, 494 U.S. 1079 (1990) (emphasis added). Therefore, Trento committed a tortious act in New Hampshire if she is liable for any injury caused by St. Martin's republication of the allegedly defamatory passages here.

Gray alleges, and offers evidence in support of his claim, that the 61 copies of The Power House that St. Martin's distributed in New Hampshire tortiously injured his reputation here. See Keeton, 465 U.S. at 777. Therefore, he presents a prima facia case that Trento committed a tortious act in New Hampshire. Because it is precisely this in-state act that motivates Gray's suit, it can be said that Gray's claim "arises

9

out of, or relates to, [Trento's] in-forum activities." Sawtelle, 70 F.3d at 1389. Thus, the first part of the tripartite due process test is satisfied.

### 2. Purposeful Availment

In order to satisfy the second part of the jurisdictional test, a plaintiff must show that the defendant's contacts with the forum represent "a purposeful availment of the privilege of conducting activities in the forum state." Sawtelle, 70 F.3d at 1389. "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's `random, isolated, or fortuitous' contacts with the forum state." Id. at 1391 (quoting Keeton, 465 U.S. at 774).

The First Circuit has identified "two cornerstones of purposeful availment." Ticketmaster, 26 F.3d at 207. One cornerstone is foreseeability: The "defendant's `conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there.'" Id. (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)) (alteration in Ticketmaster). The second cornerstone is voluntariness: "Jurisdiction may not rest on the `unilateral activity of another party or a third person.'" Id. at 207-08

10

(quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985)). With these basic principles in mind, the court turns to the parties arguments on the question of purposeful availment.

### a. <u>Calder</u> "Effects" Test

At the outset, the court notes that the mechanism through which a libel plaintiff typically establishes minimum contacts between an <u>author</u> and the forum state is unavailable to Gray here. In <u>Calder v. Jones</u>, 465 U.S. 783 (1984), the Supreme Court outlined certain situations in which the focus of the court's jurisdictional inquiry shifts from the relationship among the defendant, the forum, and the litigation, to the contacts between the plaintiff and the forum. The Court stated, "The plaintiff's lack of `contacts' will not defeat otherwise proper jurisdiction, but they may be so manifold as to permit jurisdiction when it would not exist in their absence." <u>Id.</u> at 788 (citation omitted). The <u>Calder</u> Court then found that jurisdiction existed over the authors of an allegedly libelous article distributed by their publisher in the forum state where:

> (i) [the authors'] intentional actions were aimed at the forum State, (ii) they knew that the article was likely to have a devastating impact on the plaintiff, and (iii) they <u>knew that the brunt of the injury would be felt by the plaintiff in the forum State where she</u>

11

> lived, worked and the article would have the
> largest circulation.

Hugel v. McNell, 886 F.2d 1, 4 (1st Cir. 1989) (emphasis added) (citing Calder, 465 U.S. at 789-90). The authors' knowledge that the major impact of their article would be felt in the forum state was held to constitute a purposeful contact whereby the authors could reasonably expect to be haled into the forum state's courts to defend their actions. Calder, 465 U.S. at 789-90.

In contrast, Gray has had almost no prior contacts with the State of New Hampshire. He never lived or worked in this state, and only 61 copies of The Power House ever reached the forum. Therefore, it cannot be said that Trento "knew" that the brunt of any harm from her allegedly defamatory statements would be felt in New Hampshire. Therefore, personal jurisdiction over Trento cannot be justified under Calder.

### b. Liability as a Joint Venturer

In the absence of any significant relationship between him and this forum, Gray resorts to the law of agency to show that Trento purposefully availed herself of the New Hampshire market. St. Martin's and Trento, Gray argues, were engaged in a joint venture to author and market The Power House. Because the two

12

parties were joint venturers, the argument continues, St. Martin's clear purposeful availment of the New Hampshire market is attributable to Trento as well. While creative, the argument fails because the Contract between Trento and St. Martin's creates neither a joint venture nor an agency relationship.

All parties agree that the Contract that forms the publishing agreement between St. Martin's and Trento is, by its express terms, governed by New York law. See Wolf v. Gruntal & Co., 45 F.3d 524, 527 n.3 (1st Cir. 1995) (courts should generally respect contractual choice of law provisions). According to New York law:

> In order to form a joint venture, (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.

Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 701 (2d Cir. 1990). All of these elements must be present before joint venture liability may be imposed. Id. Gray has failed to demonstrate the existence of at least two of these five elements.

First and foremost, the Contract does not evince the parties' intent to engage in a joint venture.  Rather, the Contract is a straightforward publishing agreement under which the author grants the publisher the exclusive right to distribute and sell her literary work in exchange for royalties.  This type of contract has long been held <u>not</u> to create a joint venture.  <u>Steinbeck v. Gerosa</u>, 4 N.Y.2d 302, 317-18, 151 N.E.2d 170, 179 (1958).

Second, under New York law, "the crucial element of a joint venture is the existence of `a mutual promise or undertaking of the parties to share in the profits . . . <u>and submit to the burden of making good the losses</u>.'"  <u>Mallis v. Bankers Trust Co.</u>, 717 F.2d 683, 690 (2d Cir. 1983) (quoting <u>Steinbeck</u>, 4 N.Y.2d at 317) (emphasis in <u>Steinbeck</u>).  Here, the Contract does not obligate Trento to share in the losses of marketing, distributing, and selling <u>The Power House</u>.  Rather, Trento owns the simple contractual right to receive royalties on copies sold.  Thus, this case is easily distinguishable from <u>In re Grace's Will</u>, 308 N.Y.S.2d 136 (Sur. Ct. 1970), relied upon by Gray, in which the author received no royalties but, instead, contracted for one half of "all profits . . . after defraying the expenses of printing, publishing, and selling the book."  <u>Id.</u> at 139.

14

While no one can deny that Trento and St. Martin's had a community of interest and a common economic objective, "[t]he relationship between an author and a publisher is not that of joint venturers merely because the publisher is to pay the author on the basis of receipts from the sale of books." Steinbeck, 4 N.Y.2d at 318. Therefore, the law of agency does not help Gray in his effort to show that Trento purposefully availed herself of the forum state through St. Martin's.

### c.    Stream of Commerce

While Gray advances an agency theory to support jurisdiction, Trento relies heavily on a "stream of commerce" theory in her effort to defeat jurisdiction. The First Circuit has followed a plurality of four Supreme Court justices in explicitly rejecting the notion that a defendant purposely avails herself of the forum state merely by placing a product into the stream of commerce with the knowledge that the product could end up in the forum state. Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 682-83 (1st Cir. 1992) (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102 (1987) (O'Connor, J., plurality opinion)).

15

"[A] defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state." Boit, 967 F.2d at 682 (quoting Asahi, 480 U.S. at 112 (O'Connor, J., plurality opinion)) (alteration in Boit). Therefore, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Asahi, 480 U.S. at 112 (O'Connor, J., plurality opinion) (emphasis added). Rather, a plaintiff seeking to support the assertion of personal jurisdiction must demonstrate that the defendant engaged in "additional conduct" that indicates her "intent or purpose to serve the market in the forum State." Id. (emphasis added).

Trento argues that, at most, she placed The Power House into the stream of commerce when she sold St. Martin's the right to publish the book. The Contract, she points out, grants St. Martin's sole discretion in matters of marketing, distributing, and selling the book, Contract ¶ 2(c), and her conceded knowledge that St. Martin's would distribute The Power House nationwide is not enough to show purposeful availment. World-Wide Volkswagen Corp., 444 U.S. at 295.

16

Were there no "additional conduct" on the part of Trento reflective of her intent or purpose to serve the New Hampshire market, this court could not exercise personal jurisdiction over her.  However, the evidence before the court, when viewed in a light most favorable to Gray, does suffice to show that Trento purposefully availed herself of the New Hampshire market.  Most of this evidence is contained in the Contract that governed the relationship between Trento and St. Martin's.

Trento did not simply sell a product, her manuscript for The Power House, to St. Martin's.  Rather, she granted St. Martin's the "sole and exclusive right to print, publish, distribute and sell" The Power House "throughout the world."  Contract ¶ 1(a).  Trento retained the copyright and "all other rights in the Work not granted to the Publisher."  Id. at ¶ 3, 6(c).  Unlike the defendants in Asahi and Boit, Trento did not simply sell a product to a third party, completely transferring her ownership interest in the product.  Instead, she sold the right to sell a product in which she retained an interest.  National distribution of The Power House, including distribution within the State of New Hampshire,[3] was the *raison d'etre* of the Contract between

---

[3] There is no evidence that Trento intended to exclude particular fora from the otherwise national distribution of The Power House.  The book's subject matter is not geographically

17

Trento and St. Martin's.  Therefore, Trento purposefully directed The Power House to New Hampshire through St. Martin's, notwithstanding the fact that St. Martin's retained control over distribution.

Closely related is the fact that Trento retained a direct and continuing financial stake in the widespread distribution of The Power House.  The defendants in Boit and Asahi sold products to third parties who, in turn, sold those products to others.  It is, of course, to every supplier's financial advantage when the third party to whom it sells its product resells that product; the more units the third party sells, the more additional units it will order from the supplier.  But the supplier's financial interest is directly linked to the number of units it sells to the third party, not to the number of units the third party sells to others.

In contrast, Trento supplied St. Martin's with a manuscript and, in return, received a portion of the price of each copy of The Power House St. Martin's sold to others, including those

---

limited, unlike, for instance, a guidebook to the hiking trails of Northern California might be.  Therefore, it can be said that by purposefully contracting to distribute nationally a book in which she retained the copyright and from the sale of which she would obtain royalties, Trento purposefully contracted to distribute the book in New Hampshire.

18

copies sold in New Hampshire.  Contract ¶ 5(a)(i).  Her
compensation was directly linked to the number of copies St.
Martin's sold; if St. Martin's sold no copies, Trento received no
royalties.  As a result, Trento had a direct and continuing
financial incentive to see that the book reached as many willing
buyers as possible.  This payment mechanism also evidences
Trento's intent to serve every forum encompassed by the Contract,
including consumers in the State of New Hampshire.

In short, this case does not present a simple stream of
commerce scenario.  The record shows that Trento engaged in
"additional conduct," indicating an intent or purpose to serve
the New Hampshire market.  While this evidence of purposeful
availment is not particularly strong, it is sufficiently strong
to satisfy the basic due process concerns of foreseeability and
voluntariness.  By executing a contract with a national publisher
for the national and international distribution of a book with
nationwide appeal, Trento should reasonably have anticipated
being haled into court in New Hampshire, a forum regularly served
by St. Martin's and one in which the book was actually sold.  The
terms of the Contract, including the financial incentives it
creates, also show that St. Martin's in-state distribution of The
Power House was not the distinct unilateral act of a third party,

19

but an act intended by Trento.  Therefore, Gray has made a prima facia showing that Trento purposefully availed herself of the New Hampshire marketplace.

### 3.    The Gestalt Factors

"In constitutional terms, the jurisdictional inquiry is not a mechanical exercise.  The Court has long insisted that concepts of reasonableness must inform a properly performed minimum contacts analysis."  <u>Ticketmaster</u>, 26 F.3d at 209.  Once the plaintiff has demonstrated that his claim is related to the defendant's in-forum activities and that the defendant purposely availed herself of the forum state, the court must consider "a panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal." <u>Id.</u>  The Supreme Court has identified five such factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

<u>Id.</u> (citing <u>Burger King</u>, 471 U.S. at 477).

These five so-called "gestalt factors" are not ends in themselves but are, instead, means of determining whether the assertion of jurisdiction is fundamentally reasonable and comports with constitutional concepts of fair play and substantial justice.  Id.  "[T]he reasonableness prong of the due process inquiry evokes a sliding scale:  the weaker the plaintiff's showing on the first two prongs . . ., the less a defendant must show in terms of unreasonableness to defeat jurisdiction."  Id. at 210.  Thus, a showing of unfairness may trump a minimally sufficient showing of relatedness and purposefulness.  Id.  Here, Gray made a decent showing of relatedness and a weaker, but sufficient, showing of purposefulness.  As a result, Trento must make a solid showing of unreasonableness in order to defeat jurisdiction.

### a.    The Burden of Appearance

The defendant is a Virginia resident.  Forcing Trento to appear in court in New Hampshire would burden her in terms of both time and money.  However, "defending in a foreign jurisdiction almost always presents some measure of inconvenience, and hence this factor becomes meaningful only where a party can demonstrate a `special or unusual burden.'"

21

<u>Sawtelle</u>, 70 F.3d at 1395 (quoting <u>Pritzker v. Yari</u>, 42 F.3d 53, 64 (1st Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 1959 (1995)).

Trento admits that, as a material witness in Gray's suit against St. Martin's, she will be required to travel to New Hampshire and attend portions of the trial whether she is named as a party or not. Nonetheless, she argues that as a party she would be burdened with the additional cost of mounting a defense. That cost, however, is not a cost specific to being haled into court in New Hampshire; the cost of defending would be roughly similar were she haled into court in any forum, convenient or not. In light of the fact that Trento's presence in New Hampshire will be required in any event, her burden of appearing is neither special nor unusual and, therefore, "falls short of reaching constitutional significance." <u>Id.</u>

### b. New Hampshire's Adjudicatory Interest

Gray is suing for damages he allegedly suffered in New Hampshire. "And it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the state." <u>Keeton</u>, 465 U.S. at 776 (citing <u>Leeper v. Leeper</u>, 114 N.H. 294, 319 A.2d 626 (1974)). "This interest extends to libel actions brought by nonresidents." <u>Id.</u>

22

### c. Gray's Interest in Obtaining Convenient and Effective Relief

Ordinarily, the plaintiff's choice of forum is entitled to substantial deference with respect to his own convenience. <u>Sawtelle</u>, 70 F.3d at 1395. In this case, however, New Hampshire is clearly not a convenient forum for Gray, a Florida resident. But the plaintiff also has an interest in obtaining effective, though inconvenient, relief. It appears that Gray has sued Trento in New Hampshire for the once familiar reason that the statue of limitations has run in other, possibly more convenient, fora. As the Supreme Court has stated, plaintiff's "successful search for a State with a lengthy statute of limitations is no different from the litigation strategy of countless plaintiffs who seek a forum with favorable substantive or procedural rules or sympathetic local populations." <u>Keeton</u>, 465 U.S. at 779. So Gray may legitimately take account of New Hampshire's (since modified) favorable rules when seeking effective relief for the injuries he allegedly suffered.

### d. Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy

"New Hampshire also has a substantial interest in cooperating with other States, through the `single publication

23

rule,' to provide a forum for efficiently litigating all issues and damage claims arising out of a libel in a unitary proceeding."  <u>Keeton</u>, 465 U.S. at 777.  The single publication rule reduces the burden libel cases may otherwise impose on the judicial system and protects defendants from the burden of defending multiple suits.  <u>Id.</u>  The great majority of states now follows the single publication rule.  <u>Id.</u> at 777 n.3.  Therefore, "New Hampshire's interest . . . in cooperating with other States in the application of the [rule] demonstrates the propriety of requiring [defendant] to answer to a multistate libel action in New Hampshire."  <u>Id.</u> at 777-78.

### e.    Pertinent Policy Arguments

There appear to be no broad social policies at stake in this jurisdictional dispute apart from those already taken into account in the relatedness and purposefulness inquiries and the other four gestalt factors.  <u>See</u> <u>Sawtelle</u>, 70 F.3d at 1395-96; <u>Ticketmaster</u>, 26 F.3d at 211-12.  This is particularly true in light of the Supreme Court's finding that First Amendment concerns should not enter into the jurisdictional analysis. <u>Calder</u>, 465 U.S. at 790.

## C.    Tallying the Results

Taken together, the gestalt factors militate in favor of a finding that the assertion of jurisdiction over Trento is reasonable and, therefore, comports with basic notions of fair play and substantial justice contemplated by the Due Process Clause.  Combined with the court's earlier findings that Gray has made a prima facia showing sufficient to satisfy the relatedness and purposefulness prongs of the tripartite test, this conclusion seals Trento's jurisdictional fate.  This court may assert specific personal jurisdiction over Trento consistent with both the Due Process Clause of the Fourteenth Amendment and the New Hampshire long-arm statute.

## IV.  CONCLUSION

Because this court may assert personal jurisdiction over Trento consistent with New Hampshire's long-arm statute and the United States Constitution, Trento's motion to dismiss for lack of personal jurisdiction (document no. 9) is denied.

25

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

March 28, 1996

cc:  James G. Walker, Esq.
     Mark D. Balzli, Esq.
     Cletus P. Lyman, Esq.
     William L. Chapman, Esq.
     Gayle M. Braley, Esq.