Hickey v. St. Martin's Press          CV-95-475-M    09/30/96
                    UNITED STATES DISTRICT COURT FOR THE
                            DISTRICT OF NEW HAMPSHIRE


George W. Hickey, Jr.,
        Plaintiff

v.                                              Civil No. C-95-475-M

St. Martin's Press, St. Martin's Paperbacks,
Bonar Menninger, and Simon & Schuster, Inc.,
        Defendants


                              O R D E R


        George W. Hickey, Jr. brings this action seeking

compensation for damages allegedly sustained as a result of

defendants' publication of defamatory statements about him.  He

claims that the book Mortal Error, written by defendant Bonar

Menninger and published in various iterations by St. Martin's

Press ("St. Martin's"), St. Martin's Paperbacks ("SMP"), and

Simon & Schuster ("S&S"), falsely accuses him, a former secret

service agent, of having accidentally fired the shot that killed

President Kennedy.


        Presently before the court are several dispositive motions,

which relate to three basic issues: (1) whether the statute of

limitations bars plaintiff's claims; (2) whether this court may

properly exercise personal jurisdiction over some of the defendants; and (3) whether some of the counts in plaintiff's complaint adequately plead viable causes of action.

## Facts

George Hickey is a retired Special Agent of the United States Secret Service. From 1963 to 1971, he served in the presidential and vice-presidential protective details. On the day of President Kennedy's assassination, Hickey was riding in the Secret Service vehicle immediately behind the President's limousine. As is well known, the assassin was subsequently identified as Lee Harvey Oswald, and, after examining the circumstances surrounding the President's assassination, the Warren Commission concluded that Oswald acted alone. Nevertheless, since 1963, numerous other theories regarding President Kennedy's assassination have surfaced. Since at least the early 1970's, Howard Donahue has publicly stated his belief that, in the confusion following Lee Harvey Oswald's first shot, Hickey inadvertently discharged his AR-15 rifle, firing the fatal bullet that struck President Kennedy.

2

In February, 1992, St. Martin's published the hardcover edition of Mortal Error, written by Bonar Menninger, which details Donahue's theories regarding the Kennedy assassination, including numerous statements regarding Hickey's alleged involvement not only in the shooting, but also in an alleged coverup that followed. In April, 1992, the audiotape version of Mortal Error, published by S&S, went on sale in New Hampshire. And, most recently, in September, 1992, SMP published the paperback edition of Mortal Error.

According to the unrebutted affidavit of Sidney Conde, the Warehouse and Inventory Control Manager for St. Martin's, 216,132 copies of the paperback edition of Mortal Error were printed and bound by September 2, 1992. (Conde Affidavit, para. 3-4) St. Martin's began shipping copies of the paperback edition on September 8, 1992. Retail book stores across the country began receiving copies of the paperback edition no later than September 16, 1992.

According to the unrebutted affidavit of Bob Wietrak, Vice President and Director of Merchandising for Barnes & Noble, Inc., seventy-five percent (75%) of its stores nationwide had received

3

copies of <u>Mortal Error</u> by September 20, 1992.  One of those stores is located in Nashua, New Hampshire.  (Exhibit 2 to Conde Affidavit)  So, at the very latest, the record demonstrates that the paperback edition of <u>Mortal Error</u> was available and for sale in New Hampshire on or before September 20, 1992.

## Discussion

I.   <u>The Statute of Limitations</u>

Plaintiff filed this action on October 2, 1995, slightly more than three years after the September, 1992, publication in New Hampshire of the paperback version of <u>Mortal Error</u> (the hardcover and audio tape versions having been published in New Hampshire even earlier).  Accordingly, defendants claim that plaintiff's action is barred by New Hampshire's three year statute of limitations.

The parties agree that New Hampshire law governs resolution of their dispute.  They also agree that the applicable statute of limitations is set forth in N.H. Rev. Stat. Ann. ("RSA") 508:4, which provides that, "Personal actions for slander or libel, unless otherwise provided by law, may be brought only within 3 years of the time the cause of action accrued."  Hickey advances

4

several arguments in support of his claim that his action was filed in a timely fashion; they are all unpersuasive.[1]

Hickey claims that he reasonably relied (to his detriment) on the legend set forth on the inside cover of the paperback

---

[1] Parenthetically, the court notes that as early as November, 1991, Hickey knew that St. Martin's intended to publish <u>Mortal Error</u>. On November 1, 1991, St. Martin's wrote to Hickey and, among other things, stated:

> We recognize that in the past you have declined to speak to Mr. Donahue or Mr. Menninger or to respond to press reports of Mr. Donahue's thesis. However, the situation is perhaps now different from what it was when they first contacted you. The difference is that the book -- which has been under contract to St. Martin's Press -- is now scheduled for national publication early in 1992 barring any receipt of new data invalidating Donahue's thesis.

> We would very much urge you to reconsider your decision not to speak on this subject. We would be happy to make reasonable arrangements at our expense for Mr. Menninger to interview you. (If you agree to an interview by Mr. Menninger, he would thereafter provide you with a copy of the transcript of what was said in the interview and a chance to supplement it.) Alternatively, if you prefer, you can respond directly to me.

November 1, 1991 letter to Hickey, republished in <u>Mortal Error</u> at 250-51.

At a minimum, it is clear that St. Martin's did not attempt to conceal from Hickey its intention to publish <u>Mortal Error</u>. In fact, it notified Hickey of that intention almost four years before Hickey filed this suit.

edition, which suggests that it was published in October, 1992.[2] Accordingly, he argues that equitable principles should apply to toll the statute of limitations. The court disagrees.

In <u>Keeton v. Hustler Magazine, Inc.</u>, 131 N.H. 6 (1988), the New Hampshire Supreme Court adopted the so-called "single publication rule" with regard to defamation suits and noted that:

> States adopting the [single publication] rule generally hold, . . . that the plaintiff's cause of action accrues for limitations purposes on the first date that the publisher releases the finished product for sale.

<u>Id</u>. at 11. Accordingly, the publication date shown on the inside cover of the offending text would seem to have little bearing on the limitations analysis. <u>See, e.g.</u>, <u>Morrissey v. William Morrow & Co.</u>, 739 F.2d 962, 967 (4th Cir. 1984) ("The use of arbitrary `official publication dates' has been recognized as to books and not found to be determinative of the date of publication."), <u>cert. denied</u>, 469 U.S. 1216 (1985); <u>Fleury v. Harper & Row, Publishers, Inc.</u>, 698 F.2d 1022, 1028 (9th Cir.) ("Plaintiffs

---

[2] Despite the fact that the paperback version of <u>Mortal Error</u> was on sale in New Hampshire no later than September 20, 1992, the inside cover of the book bears the following legend:

St. Martin's Press hardcover edition published 1992
St. Martin's Paperbacks edition/October 1992

6

contend that they are entitled to rely on December 25, 1978, the date selected by the author, as the date of publication, and that defendants are "estopped." This is not the law. The precedents with almost complete uniformity hold that publication occurs at the time of actual communication of the libel, not the date on the cover of the newspaper, magazine, or other printed matter."); cert. denied, 464 U.S. 846 (1983).

In light of the fact that New Hampshire has joined "the great majority of States that now follow the [single publication] rule," Keeton, 131 N.H. at 11 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 777 n.8 (1984)), it is logical to conclude that the New Hampshire Supreme Court would also apply the majority rule regarding accrual of causes of action: the plaintiff's cause of action accrues on the day that the publisher first makes the allegedly defamatory product available for sale.

In the absence of any clear indication from the New Hampshire Supreme Court that it would deviate from the majority rule under the facts of this case, this court is not inclined to expand upon the existing interpretations of the New Hampshire

7

statute of limitations in the sweeping manner advocated by plaintiff. A federal court called upon to apply state law must "take state law as it finds it: `not as it might conceivably be, some day; nor even as it should be.'" Kassel v. Gannett Co., 875 F.2d 935, 950 (1st Cir. 1989) (quoting Plummer v. Abbott Laboratories, 568 F.Supp. 920, 927 (D.R.I. 1983)). When state law has been authoritatively interpreted by the state's highest court, this court should apply that law according to its tenor. Kassel, 875 F.2d at 950. When the signposts are blurred, the federal court may assume that the state court would adopt an interpretation of state law that is consistent with logic and supported by reasoned authority. Moores v. Greenberg, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987). However, this court is and should be hesitant to blaze new, previously uncharted state-law trails. Expansive reading of New Hampshire's statutes of limitation is a realm best occupied by the New Hampshire Supreme Court.

The court is, therefore, constrained to hold that Counts 1 and 2 are barred by the New Hampshire statute of limitations. Nevertheless, the remaining counts, which allege damages flowing from republication of the allegedly defamatory statements

contained in Mortal Error, are not time barred.  Accordingly, the court turns to the remaining dispositive motions which relate to those counts.


II.   Personal Jurisdiction

Bonar Menninger asserts that, because he lacks the requisite "minimum contacts" with this forum, the court cannot exercise personal jurisdiction over him.  Specifically, Menninger claims that:

> 1.   "Although I did visit my mother in New Hampshire during the time I was engaged in researching and writing Mortal Error, I did no work on the book during those visits." (Menninger affidavit, para. 4);
>
> 2.   "In researching and writing Mortal Error, I did no work in New Hampshire, used no sources in New Hampshire, and had no contact with New Hampshire either by telephone or through the mail."  (Menninger affidavit, para. 6);
>
> 3.   "While drafting Mortal Error, I had no information suggesting that George W. Hickey, Jr. had any connection with New Hampshire, and I did not believe that he did have such a connection."  (Menninger affidavit, para. 7); and
>
> 4.   "After beginning my research and writing of Mortal Error, I entered into an agreement with St. Martin's Press wherein I sold worldwide publication rights to the book to St. Martin's Press.  Under our agreement, once I completed work on the book, St. Martin's had the exclusive control over publication of the book.  The agreement specifically provided that `[a]ll decisions . . . involving terms of sale, distribution,

9

> advertising, and promotion of the Work shall be within the Publisher's sole discretion.'  I had no involvement in making any of those decisions."  (Menninger affidavit, para. 8).

In short, Menninger asserts that although he lived in New Hampshire from 1973 to 1978, owns an interest in real estate in New Hampshire, and, about once a year, visits family members who reside in this state, none of his contacts with this forum specifically relate to plaintiff's alleged injuries arising out of his book, Mortal Error.

In Gray v. St. Martin's Press, Inc., 929 F.Supp. 40 (D.N.H. 1996), the court addressed the same issues raised by Menninger here.  The reasoning and legal basis for its holding in Gray, supra, need not be restated.  It is sufficient to note that the court concluded:

> By executing a contract with a national publisher for the national and international distribution of a book with nationwide appeal, [defendant] should reasonably have anticipated being haled into court in New Hampshire, a forum regularly served by St. Martin's and one in which the book was actually sold.  The terms of the Contract, including the financial incentives it creates, also show that St. Martin's in-state distribution of [the subject publication] was not the distinct unilateral act of a third party, but an act intended by [defendant].

_Id_. at 48.  Menninger's contract is substantially similar in all material respects.  _See_, "St. Martin's Press Contract" between St. Martin's Press and Bonar Menninger, dated December 26, 1990 (Exhibit 1 to Plaintiff's Opposition to Defendants' Motion to Dismiss).

For essentially the same reasons detailed in _Gray_, the court holds that it may exercise specific personal jurisdiction over Menninger consistent with both the Due Process Clause of the Fourteenth Amendment and the New Hampshire long arm statute, RSA 510:4.  Similarly, the court holds that it may properly exercise personal jurisdiction over defendants St. Martin's, SMP, and S&S. _See generally_ _Gray v. St. Martin's Press_, _supra_.

III. Liability for "Republication" of Defamatory Statements

Defendants next assert that the court should dismiss counts 4 and 5 of plaintiff's second amended complaint, claiming that those counts fail to state claims upon which relief may be granted.  Specifically, they assert that, "Plaintiff has failed to allege that Bonar Menninger or St. Martin's Press authorized, assented to or participated in any republication of _Mortal Error_."  Defendants' Motion to Dismiss (document no. 28), para.

11

4. <u>See also</u> Defendant Simon & Schuster, Inc.'s Motion to Dismiss (document no. 29).

Citing primarily New York law, defendants claim that absent their specific authorization or participation in republication of the allegedly defamatory statements contained in <u>Mortal Error</u>, they cannot be held liable on a "republication" theory.  The court disagrees.  As noted in <u>Gray v. St. Martin's Press</u>:

> In formulating its law of defamation, New Hampshire generally adheres to the rules set out in the Restatement (Second) of Torts.  Under certain circumstances, the Restatement assigns liability for harm caused by a third party's repetition of a defamatory statement to the party who originally published that statement.

<u>Id</u>. at 45 (citations omitted).  As plaintiff points out, the Restatement specifically provides that, "The publication of a libel or slander is a legal cause of any special harm resulting from its repetition by a third person if . . . <u>the repetition was reasonably to be expected</u>."  Restatement (Second) of Torts § 576 (1976) (emphasis added).

Accordingly, the fact that defendants claim to have neither authorized nor participated in the republication of the allegedly

12

defamatory statements contained in <u>Mortal Error</u> would seem to be of no moment <u>if</u> they reasonably should have expected that those statements would be republished by third parties. Stated somewhat differently, the dispositive question becomes whether third-party republications were reasonably foreseeable. <u>See, e.g.</u>, <u>Davis v. National Broadcasting Company</u>, 320 F.Supp. 1070, 1072 (E.D.La. 1970) (in a defamation action following the acquittal of Clay Shaw on charges of conspiracy to assassinate President Kennedy, the court noted that, "The general rule is that one who publishes a defamatory statement will not be held liable for the repetition of it by others. When, however, the second publication is a natural and probable consequence of the first, the initial publisher is responsible for it."), <u>aff'd</u> 447 F.2d 981 (5th Cir. 1971).

Whether defendants should have reasonably foreseen the republication of the allegedly defamatory statements contained in the various published forms of <u>Mortal Error</u> is a question of fact. <u>See</u>, <u>id</u>. Understandably, that fact is not only material to the resolution of this case, it is disputed. Accordingly, summary judgment with regard to liability for third party

13

republication of the statements contained in <u>Mortal Error</u> is not available to either plaintiff or any of the defendants.

## Conclusion

For the foregoing reasons, the court resolves the motions presently pending before it as follows:

1.    Defendants' motion for summary judgment on statute of limitations grounds (document no. 13) is granted with regard to counts 1 and 2.  In all other respects, it is denied;

2.    Plaintiff's cross motion for summary judgment on statute of limitations grounds (document no. 21) is granted with regard to counts 3 through 5.  In all other respects, it is denied.  That is to say, counts 3 through 5 are not barred by the applicable statute of limitations;

3.    Defendants' motion to dismiss for lack of personal jurisdiction (document no. 14) is denied;

4.    Defendants' motion to dismiss counts 4 and 5 (document no. 27) is denied;

5.    Defendants' motion to dismiss for failure to state a claim (document no. 28) is denied;

6.    Defendant Simon & Schuster's motion to dismiss (document no. 29) is denied;

7.    Defendants' motion for protective order to stay discovery (document no. 44) is denied as moot; and

14

8.    Plaintiff's motion for a jury trial to determine defendants' foreseeability of third-party republications (document no. 38) is denied as moot.  This case is scheduled for a jury trial, and the jury will decide all issues properly submitted to it.


SO ORDERED.


_____
Steven J. McAuliffe
United States District Judge

September 30, 1996

cc:   James H. Lesar, Esq.
      Mark S. Zaid, Esq.
      Mark H. Campbell, Esq.
      William L. Chapman, Esq.