Cheshire
No. 84-374

STEPHEN T. NASH

v.

KEENE PUBLISHING CORPORATION,
d/b/a THE KEENE SENTINEL

August 16, 1985

*Bragdon, Berkson & Mangones*, of Keene (*H. Neil Berkson* and *James R. Davis* on the brief, and *Mr. Berkson* orally), for the plaintiff.

*Bell, Falk & Norton P.A.*, of Keene (*Arnold R. Falk* on the brief and orally), for the defendant.

SOUTER, J. The plaintiff appeals an order of the Superior Court (*O'Neil*, J.) granting summary judgment for the defendant in this libel action. We reverse and remand for trial.

The plaintiff is a police officer for the city of Keene. He was on duty the evening of May 10, 1982, when he saw Renauld Desmarais driving a car, allegedly with its lights off. The plaintiff tried to stop Desmarais, who led him on a low-speed chase that ended when the police cruiser hit Desmarais's car. The plaintiff arrested Desmarais

for several violations, including driving under the influence, and eventually took him to the hospital for treatment. While they were at the hospital the plaintiff physically restrained Desmarais.

On May 11, 1982, the defendant published a brief account of the arrest in its newspaper, *The Keene Sentinel*, although the report did not disclose that Desmarais had been charged with driving under the influence. The next day Desmarais came to the paper in an agitated state. He met with the defendant's employee, Guy MacMillin, to whom he delivered a scrawled, handwritten draft of a letter for publication in response to the news story.

MacMillin read Desmarais's draft and asked Desmarais to give his version of the events in question. Desmarais told his story, although he did not mention that the police had charged him with driving under the influence. The letter itself imputed behavior to the plaintiff, as well as personal limitations and proclivities, that would be highly undesirable in a police officer, and alleged that the plaintiff had been the subject of "numerous complaints" known to the assistant city attorney. MacMillin later called the assistant city attorney, who told him that he had received only one complaint about the plaintiff, that one from Desmarais himself concerning the incidents in question. MacMillin did not attempt to verify any other allegations, whether by asking the assistant city attorney, the police department or the plaintiff.

MacMillin testified that "as distasteful as I found the letter, I felt that if someone feels that the police are not behaving in the proper way, they ought to be able to say so, and after some deliberation I decided that that—that right was predominant in this case, and I decided to use the letter with [an] editor's note." In response to further questions on deposition, MacMillin testified that he did not believe that a person dissatisfied with the police had a right to publish false charges. He stated that it had not occurred to him that Desmarais's charges were untrue. But he added that "reasonable people might disagree as to what is truth and untruth in these instances," and said that Desmarais had been "pretty persuasive."

Thereafter, having eliminated profanity from the draft, the *Sentinel* published the letter on May 13, in this form:

"Specific facts
To The Sentinel:
As for specific facts:

1. I was stopped at the corner of Victoria and Water Streets when Officer Nash's cruiser hit my vehicle.

2. He hit me: The dent and blue paint on the driver's side door proves it. (He can't drive.)

3. Because of one cop's stupidity Keene just lost another cruiser (myself a car).

3. This is his sixth cruiser he zeroed, and I don't drive with my lights off.

4. Nash is a Wyatt Earp who likes to assault perpetrators (allegedly).

5. He muscled me with both hands handcuffed, lying in a hospital bed ( a real man).

6. He's done it before, and will do it again to you.

7. Assistant City Attorney David Park has numerous complaints on the matter of Nash.

8. Eh, what's happening to Keene? Go to sleep. Don't get involved.

RENAULD R. DESMARAIS
259 Marlboro St.
Keene

*EDITOR'S NOTE: Attorney Park denies he has received complaints about Patrolman Nash, except from Dr. Demarais [sic] with regard to his recent arrest.*

(Italics in original.)

The page of the newspaper on which the letter was printed contained one other set of statements that are relevant to this case: "Letters Policy: The readers' column is for your opinions. . . . [W]e do not publish letters we feel to be libelous . . . or that make allegations we are unable to verify independently."

After publication, the plaintiff obtained legal counsel, and on June 2, 1982, his lawyer demanded a retraction and apology. On June 16, 1982, the defendant published an apology, which noted in some detail that it had been unable to substantiate Desmarais's statements "except the facts about where and how Patrolman Nash stopped Desmarais' vehicle, allegedly after a brief, low-speed pursuit." Despite the apology, this litigation followed.

In response to the plaintiff's declaration, the defendant filed a brief statement claiming, *inter alia*, that the plaintiff was a public official or public figure and that the defendant had published the letter without malice. Later the defendant filed a motion for summary judgment, again claiming that the plaintiff was a public official, that the defendant had published without malice, and maintaining further that the letter was an expression of opinion. The plaintiff objected to the motion.

Neither party filed affidavits in support of the positions taken, but the parties did file interrogatories and responses, MacMillin's deposition, and an agreed statement of facts, which included the stipula-

tion that the defendant "had no actual knowledge that the letter was false." Given the language quoted, we infer that the plaintiff intended to make no claim that there was libel in the allegation that the plaintiff had been the subject of numerous complaints, since it is clear that the defendant did know of the falsity of that allegation.

The superior court found that there was no genuine issue of material fact. It went on to find that the defendant was entitled to summary judgment because the letter was an expression of opinion, and for the further reasons that the plaintiff was a public official and the defendant did not publish with actual malice.

As in any appeal from a ruling on a motion for summary judgment, it is important to start with a reminder of the exact nature of the issue that such a motion raises. The moving party has the burden to demonstrate that there is "no genuine issue as to any material fact and that [he] is entitled to judgment as a matter of law." RSA 491:8-a, III. As we have noted, the trial court found that on three issues of fact there was no genuine dispute, with the result that it held the defendant entitled to judgment as a matter of law.

The first such issue concerned the character of the letter, as alleging fact or expressing opinion. This issue arose under the basic rule that for actionable libel, there must be publication of a false statement of fact, RESTATEMENT (SECOND) OF TORTS § 581A (1977), that tends to lower the plaintiff in the esteem of any substantial and respectable group of people. *Duchesnaye v. Munro Enterprises, Inc.*, 125 N.H. 244, 252, 480 A.2d 123, 127 (1984). Conversely, a statement of opinion is not actionable, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974); *Pease v. Telegraph Pub. Co., Inc.*, 121 N.H. 62, 65, 426 A.2d 463, 465 (1981), unless it may reasonably be understood to imply the existence of defamatory fact as the basis for the opinion. *Duchesnaye v. Munro Enterprises, Inc., supra* at 249, 480 A.2d at 125; RESTATEMENT (SECOND) OF TORTS § 566 (1977). Whether a given statement can be read as being or implying an actionable statement of fact is itself a question of law to be determined by the trial court in the first instance, *Pease v. Telegraph Pub. Co., Inc., supra* at 65, 426 A.2d at 465, considering the context of the publication as a whole. *See Morrissette v. Cowette*, 122 N.H. 731, 733, 449 A.2d 1221, 1222 (1982). If an average reader could reasonably understand a statement as actionably factual, then there is an issue for a jury's determination, and summary judgment must be denied. *See Pease v. Telegraph Pub. Co., Inc. supra.*

Thus the first question before us is whether the trial court was correct in finding that no average reader could have understood the letter to be stating or implying fact rather than opinion. We hold

that it was error to find that there was no genuine issue between the parties on this point and error to find that the letter must be read as a non-actionable expression of opinion.

The trial court attempted to explain away the statements in the letter as nothing but the hyperbolic expressions of Desmarais's animus against the plaintiff. The court seemed to regard the allegations as too obviously exaggerated to be taken as factual and concluded, therefore, that they must be expressions of opinion.

We cannot agree. Although the defendant's statement of "Letters Policy" described the readers' column as a place for opinions, the letter itself can obviously be read as stating facts. The defendant printed "Specific facts" in large print above the letter, and the letter began with the phrase, "As for specific facts:". There followed a series of statements that were ostensibly factual and defamatory: the plaintiff had "zeroed" six police cruisers; the plaintiff "likes to assault perpetrators (allegedly)"; the plaintiff "muscled" Desmarais when the latter was handcuffed in a hospital bed.

■ Whether readers actually did understand the statements as factual is, of course, not a matter that is before us. But it is clear that the trial court erred in determining that readers could not understand them as factual. In effect, the trial court's ruling resolved an issue that is properly for the consideration of a jury. Given this conclusion, we need not analyze the letter further to disclose other apparently factual statements or implications that could be the subject of liability and genuine dispute.

The second matter úpon which the trial court found no genuine dispute as to material fact was the status of the plaintiff as a public official. The court ruled as a matter of law that the plaintiff was such an official, with the consequence that he could not recover without clear and convincing proof that the defendant had acted with actual malice in publishing a false and defamatory statement concerning the plaintiff's official conduct. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 283–84 (1964). *Cf. Dun & Bradstreet v. Greenmoss Builders, Inc.,* 105 S.Ct. 2939 (1985); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974). We cannot agree with the trial court's conclusion on this matter.

■ The criteria for identifying a public official for purposes of the law of libel were enunciated in *Rosenblatt v. Baer,* 383 U.S. 75 (1966). While as a general rule those within the "lower ranks of government employees," *id.* at 85, should not be classed as public officials, the *New York Times* rule "applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the

conduct of governmental affairs." *Id.* (footnote omitted). Such an official's position characteristically has "such apparent importance that the public has an independent interest in [his] qualifications and performance . . . beyond the general public interest in the qualifications and performance of all government employees. . . ." *Id.* at 86. It must appear that the plaintiff's position "would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion" provoked by the defamation alleged. *Id.* at 87 n.13.

Later cases have illuminated these criteria by discussing the principal assumptions that underlie their policy. First, the public official or public figure is an individual with such access to the media of communications that he is able to respond to defamation more effectively than the typical private plaintiff can. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 344. Second, the public official or figure is a person "who might be assumed to 'have voluntarily exposed [himself] to increased risk of injury from defamatory falsehood.'" *Time, Inc. v. Firestone*, 424 U.S. 448, 456 (1976) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345). This latter consideration has been described repeatedly as normative rather than factual, requiring a judgment about the exact point at which to draw the line between the public and private plaintiff. *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 164 (1979); *Gertz v. Robert Welch, Inc. supra.*

In seeking to apply these criteria and their underlying policy to the characteristics of a police patrolman's job, the defendant relies on the reasoning of cases from other jurisdictions to support his argument that a patrolman is a public official as a matter of law. We quote one characteristic example:

> "The cop on the beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official.
>
> Police officials have uniformly been treated as public officials within the meaning of *New York Times.*"

*Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (citations omitted).

However persuasive this reasoning may be in answering the question whether a patrolman is a public official, we do not believe

that it speaks to the question whether he must be held to be a public official as a matter of law. Indeed, cases like *Gray* from other jurisdictions do not address the New Hampshire rule, which is unusual, that the determination of public official or public figure status is a jury question. *McCusker v. Valley News*, 121 N.H. 258, 428 A.2d 493, *cert. denied*, 454 U.S. 1017 (1981); *Baer v. Rosenblatt*, 108 N.H. 368, 237 A.2d 130 (1967).

 It is true, of course, that this jury issue, like any other, always presents a threshold question of law, whether any reasonable trier of fact could find a given plaintiff to be a public official, *see Baer v. Rosenblatt supra*, or could find him to be anything else, *see Thomson v. Cash*, 119 N.H. 371, 376–77, 402 A.2d 651, 655 (1979) (Governor obviously a public official). When we address the latter question, however, we are satisfied that a patrolman should not be considered a public official as a matter of law, under the *New York Times* rule.

While it is true that the patrolman's position and conduct invite public comment, it is equally true that such an officer could be found to be within what the *Rosenblatt* Court described as the lower ranks, without substantial responsibility for the control over the conduct of governmental affairs. When the criteria thus point in different directions, and any decision must have a normative function, the courts must respect the traditionally broad role of the jury in this State, a role that includes the consideration of normative as well as factual issues. Accordingly, the judgment about official status in this case should be left to the jury on a full exposition of the facts. In so holding, we affirm and apply *McCusker v. Valley News supra* (jury question whether deputy sheriff with long history of holding elective offices, including that of sheriff, was public official).

 While the plaintiff was not a public official as a matter of law, it is, of course, possible that a jury may find him to be one. If a jury does so find, the plaintiff will have the burden to prove not only that the defendant published a false and defamatory statement of fact reflecting on the plaintiff's official capacity, but also to prove by clear and convincing evidence that the defendant acted with actual malice. That is, the plaintiff may have the burden to prove that the defendant acted either with knowledge of the falsity or with a reckless disregard for truth or falsity. *New York Times Co. v. Sullivan*, 376 U.S. at 279–80. Since the parties in this case have stipulated that the defendant had no knowledge of falsity, the plaintiff may have to prove reckless disregard.

The presence or absence of such reckless disregard is thus the third of the issues of fact upon which the trial court found, favorably

to the defendant, that there was no genuine dispute. "Taking plaintiff Nash's best set of facts, [the trial court ruled] as a matter of law that plaintiff [had] not proffered clear and convincing evidence" from which reckless disregard could be inferred. We believe that this was error.

Whether or not the plaintiff "proffered clear and convincing evidence" of reckless disregard, there was some evidence of reckless disregard. The court therefore erred in concluding that there was no genuine issue of material fact relating to reckless disregard, and in ruling that the defendant was entitled to judgment as a matter of law.

 To understand where we believe the trial court was mistaken, it is necessary to examine in some detail the treatment of reckless disregard by the Supreme Court of the United States. It is clear at the start that mere negligence in failing to verify statements and discover falsity does not rise to the level of reckless disregard for truth or falsity. Failure to investigate does not in itself establish bad faith. *See New York Times Co. v. Sullivan,* 376 U.S. at 287–88. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968).

 The Supreme Court has held, rather, that where malice is said to consist of reckless disregard there must be proof of a "high degree of awareness of . . . probable falsity. . . ." *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964). The Court later described this same requirement by saying that "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson, supra* at 731.

 This requirement of awareness of probable falsity, or serious doubt, poses great difficulty for a defendant seeking summary judgment. As an evidentiary issue at trial, proof of such awareness will usually depend in part on an assessment of the defendant's own credibility, an assessment that is extremely difficult, if not impossible, to make without the defendant's testimony. In almost every case, moreover, proof of the defendant's state of mind will rest on circumstantial evidence. Thus, the issue of malice "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9 (1979).

 One response to the difficulty of determining state of mind, of course, would be to preclude summary judgment entirely in public official libel cases, unless the defendant was entitled to judgment

on some dispositive issue other than malice. We think it is unnecessary to go that far, however. We hold instead that in such a case a court must find that there is a genuine issue about the existence of malice if the material submitted on motion for summary judgment indicates that there is at least some affirmative circumstantial evidence from which malice could be inferred. *See* 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2730, at 238 and 245 (2d ed. 1983). This standard recognizes that it would simply be unrealistic to require a trial court at the summary judgment stage to determine whether the evidence in question has such probative force that a reasonable trier of fact could find malice to a clear and convincing degree. It would be unrealistic because the probative force of evidence cannot be assessed by weighing individual pieces of evidence in isolation; it must be assessed by considering each item of evidence in the totality of all the other relevant evidence that comes in. To require such an assessment at the summary judgment stage, therefore, would call for the presentation of so much evidence on the issue of malice that the summary judgment proceeding would become the approximation of a full trial.

In determining whether there is a sufficient quantum of circumstantial evidence to withstand summary judgment in this case, the language of the Supreme Court is particularly helpful. The Court has explained that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. at 732 (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967)). In *Curtis*, "[t]he Supreme Court . . . held that actual malice may be inferred when the investigation for a story which is not 'hot news' was grossly inadequate in the circumstances." *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir.) (upholding denial of summary judgment in a case with public figure plaintiff), *cert. denied*, 404 U.S. 864 (1971).

Applying these standards of circumstantial evidence, it is clear that the letter at issue in this case contained no "hot news," as MacMillin readily admitted. It is likewise clear that a trier of fact could find on the record that there were obvious reasons to doubt veracity and accuracy, and that the failure to investigate further was grossly inadequate.

Desmarais appeared before MacMillin in an agitated state and presented a scrawled draft containing profanity. MacMillin knew that Desmarais had been charged with driving under the influence, but Desmarais failed to mention this in his description of the encounter with the plaintiff. When MacMillin took it upon himself to verify one statement out of the several damaging assertions, he

found it to be false: the assistant city attorney told him that he had not received numerous complaints about Nash. At least one other factual assertion was implausible: it is unlikely that the city would continue to employ a patrolman who had "zeroed" five police cruisers before the incident in question. These were obvious reasons to doubt Desmarais's veracity and the accuracy of his statements, but the defendant made no further effort to investigate. He did not ask Park any further questions, and he made no call to the police department to ask if Nash had had other cruiser accidents.

It could be found on this evidence that this was not a mere instance of negligent failure to verify, but a failure to verify in the face of affirmative evidence of falsehood and inaccuracy. The extent of the inquiry could be found grossly inadequate. Under *St. Amant,* then, the evidence would be sufficient to go to a jury on the issue of reckless disregard, and for that reason the defendant was not entitled to judgment as a matter of law. What a jury may do with such evidence in the context of a fully tried case is, naturally, an open question, as is the extent of any recovery in the light of the defendant's later correction and apology. But the plaintiff is entitled to his trial.

*Reversed.*

All concurred.