NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Grafton
Case No. 2022-0197
Citation: Richards v. Union Leader Corp., 2024 N.H. 49


DANIEL RICHARDS

v.

UNION LEADER CORPORATION & a.

Argued: March 21, 2023
Opinion Issued: September 4, 2024


Lehmann Major List, PLLC, of Concord (Richard J. Lehmann on the brief), and Allen Harris PLLC, Narberth, Pennsylvania (Samantha Harris on the brief and orally), for the plaintiff.


Malloy & Sullivan, Lawyers Professional Corporation, of Hingham, Massachusetts (Kathleen C. Sullivan on the brief and orally), for defendant Union Leader Corporation.


Rath, Young and Pignatelli, P.C., of Concord (Michael S. Lewis on the brief and orally), for defendant Robert Azzi.

American Civil Liberties Union of New Hampshire Foundation, of Concord (Gilles R. Bissonnette and Henry R. Klementowicz on the brief), for American Civil Liberties Union of New Hampshire, New England First Amendment Coalition, and GLBTQ Legal Advocates & Defenders, as amici curiae.

BASSETT, J.

[¶1] The plaintiff, Daniel Richards, appeals a decision of the Superior Court (Bornstein, J.) dismissing his complaint alleging defamation and invasion of privacy — false light against the defendants, Union Leader Corporation (Union Leader) and Robert Azzi. Union Leader cross-appeals the superior court's finding that certain statements contained in the newspaper column at issue (hereinafter, "op-ed") pertained to the plaintiff, and its decision not to take judicial notice "about the existence of controversy and debate surrounding Critical Race Theory and the definition of White supremacy." We affirm.

I

[¶2] The following facts are derived from the plaintiff's complaint, or from documents sufficiently referred to in the complaint and whose authenticity no party disputes. See Beane v. Dana S. Beane & Co., 160 N.H. 708, 711-12 (2010). The plaintiff is the father of two children enrolled in the Hanover School District (the district). In 2021, the district "began sending parents an increasing number of communications about [its] increasing focus on 'equity' and 'anti-racism.'" The communications indicated that the district was planning "significant curricular changes around these issues." The plaintiff was "concerned by materials that he learned were in use in the school district." While he believed the curricular changes were "well-intentioned," the plaintiff believed that the changed curriculum was "deeply divisive and ultimately harmful to the goal of a quality education and a society where everyone is treated equally."

[¶3] As a result of his concerns about the district's proposed curriculum changes, the plaintiff supported "legislation that prohibits New Hampshire schools from teaching children that they are 'inherently racist, sexist, or oppressive, whether consciously or unconsciously.'" The parties agree that this legislation was House Bill 544 (HB 544). The plaintiff submitted public testimony in favor of the bill.

[¶4] On June 18, 2021, the Union Leader published the following op-ed, written by Azzi, titled "White supremacists reveal content of their character":

2

YET ANOTHER white supremacist — Newt Gingrich — has emerged to hector New Hampshire about what it should think about Critical Race Theory (CRT) and systemic racism by misappropriating MLK's "... dream of a nation in which people are judged not by the color of their skin, but by the content of their character ..."

Today, we know well the content of Gingrich's character.

<u>Desperate to stay bonded to America's original sins of slavery and genocide of indigenous peoples, Gingrich, Frank Edelblut, Dan Richards, Mike Moffett, Joseph Mendola, and others have disseminated, across multiple media platforms, white supremacist ideology</u> to keep Americans from learning an unexpurgated American history from its 1619 origins alongside the dominant White 1776 narrative.

Today, we know well the content of their character.

Espousing a form of anti-American excrescence entitled "1776 Action" — Gingrich and fellow travelers falsely assert: "Critical Race Theory-based curriculum, which pits students against one another on the basis of race, is being forced on students all across America. It rejects the central message of our founders as well as Martin Luther King Jr. — that we are all individuals created equal in the image of God — and it's taking our country backwards."

Whoever utters such calumnies are either ignorant beyond redemption or, more likely, unreconstructed White apologists looking to conceal the truth of systemic racism and its pernicious effects on people of color and minority communities.

While it's true, as Gingrich says, that "America is a better place today because great leaders like Rev. Martin Luther King Jr. chose to embrace the premise, and the promise, of America ..." it is equally true that in spite of generations of promises, America has failed many of them.

It's equally true that many Americans — like MLK, Medgar Evers, Fred Hampton, and Malcolm X — were harassed, spied upon, and assassinated fighting for respect, dignity, and rights promised to them in the Declaration of Independence so highly valued by HB 544's proponents.

It's not just about the 1830 Indian Removal Act, the 1882 Chinese Expulsion Act, the over 4,400 lynchings, the 1921 Tulsa pogrom,

3

the "Tuskegee Study of Untreated Syphilis in the Negro Male," the 1939 refusal to allow the SS St. Louis to disembark 900 Jews fleeing Nazi Germany, the internment of Japanese-Americans — about Emmett Till, Tamir Rice, George Floyd — it's about contextualizing American history; about persistent racial exploitation and trauma and their disproportionate effects on generational health and wealth.

When Education Commissioner Edelblut says that proposed state legislation "will help instill confidence in parents that our basic values are not being compromised," which values is he touting? The values of the last state to have a paid holiday honoring MLK or the values of a just people committed to truth and human dignity?

It is not true that CRT teaches children that one race is superior to another and to assert such is dishonest, provocative and dangerous.

It is true, as Edelblut notes, that Ibram X. Kendi wrote that "… [t]he only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination … The only remedy to present discrimination is future discrimination," but Edelblut fails to allow Kendi to define what he means.

Kendi continues: "… As President Lyndon B. Johnson said in 1965, 'You do not take a person who, for years, has been hobbled by chains and liberate him, bring him up to the starting line of a race and then say, "You are free to compete with all the others," and still justly believe that you have been completely fair.'" As U.S. Supreme Court Justice Harry Blackmun wrote in 1978, 'In order to get beyond racism, we must first take account of race. There is no other way. And in order to treat some persons equally, we must treat them differently.'"

Buried in the budget bill because it can't pass on its own, it may be moot whether this illegitimate calumny passes, whether a politically-ambitious governor signs it or not.

<u>Those who favor whitewashing history — favor suppressing the grievances and rights of Americans unlike themselves — favor suppressing the franchise of citizens who don't look like them — have shown they'll lie</u>, go to any lengths, propose any laws, <u>to protect their privilege and power</u> over others. Most repugnant are those who distort, decontextualize, and misrepresent truth-tellers like MLK and Kendi when they talk about race and oppression.

Today, we know who they are.

That such a coven of mendacious White men — who arrogantly assume they've a right to speak for both oppressor and oppressed — is so willing to reveal such bias is not only repugnant but anti-American, contrary not only to Granite State values but contrary to universal values of social justice, freedom, equity, equal rights and human dignity.

Today, we know them well.

(Emphases added.)

[¶5] In September 2021, the plaintiff filed his complaint, alleging that the publication of the op-ed has lowered his reputation in his community, threatens his business interests, and may negatively influence employees within his company. The complaint alleged one count of defamation and one count of invasion of privacy — false light, based upon the language in the op-ed that is emphasized above. Each defendant filed a motion to dismiss the complaint. Among the arguments made for dismissal were: (1) the op-ed is constitutionally protected speech related to matters of public concern; (2) the statements contained within the op-ed are non-actionable opinion; (3) the plaintiff is a public figure and the defendants did not act with actual malice; (4) the court should not recognize the common law tort of false light; and (5) even if it were to recognize the tort, the plaintiff failed to allege sufficient facts to sustain a cause of action.

[¶6] After conducting a hearing on the motions to dismiss, the trial court issued a narrative order granting the motions with prejudice. The trial court first set forth the five statements that the plaintiff alleged are defamatory and paint him in a false light:

1. That the plaintiff and other named individuals are "[d]esperate to stay bonded to America's original sins of slavery and genocide of indigenous peoples;"

2. This group, including the plaintiff, has "disseminated, across multiple media platforms, white supremacist ideology;"

3. "Those who favor whitewashing history . . . favor suppressing the grievances and rights of Americans unlike themselves;"

4. "Those who favor whitewashing history . . . favor suppressing the franchise of citizens who don't look like them;" and

5

5. "Those who favor whitewashing history . . . have shown they'll lie . . . to protect their privilege and power."

The trial court sorted the statements into two groups. Statements in the first group it identified mention the plaintiff by name, while statements in the second group generally reference "those who favor whitewashing history" without identifying any named individuals. The trial court concluded, however, that when read as a whole, the entire op-ed "is clearly directed at the plaintiff as being a member of the small group identified at the beginning of the op-ed" and, therefore, the question becomes whether all five identified statements "are provable false and defamatory or merely opinion."

[¶7] After reviewing the challenged statements, the trial court concluded that each amounted to non-actionable opinion, not premised on any undisclosed defamatory facts, and dismissed the claim. In doing so, the trial court declined to take judicial notice, as requested by the defendants, of the debate surrounding "Critical Race Theory, as well as the debate surrounding what is meant by white supremacist or white supremacy," concluding that it did not need to do so in order to make its decision. It also declined to address whether the plaintiff "can properly be considered a public figure or official." In addition, having found that the statements were non-actionable opinion, the trial court declined to address the defendants' constitutional arguments.

[¶8] Finally, the trial court considered whether the plaintiff had stated a claim for invasion of privacy — false light. The defendants argued that the tort of false light has not been, and should not be, recognized in New Hampshire, but even if it were, the plaintiff had failed to state a claim. The trial court declined to address whether a tort of invasion of privacy — false light should be recognized in New Hampshire, ruling instead that even if such a tort were to be recognized in New Hampshire, the plaintiff's claim would fail. The court ruled that because the statements were Azzi's opinion, the plaintiff had failed to demonstrate that Azzi "'had knowledge of or acted in reckless disregard as to the falsity of the publicized matter.'" (Quoting Restatement (Second) of Torts § 652E.) Accordingly, the trial court dismissed the claim. This appeal and cross-appeal followed.

II

[¶9] In reviewing an order granting a motion to dismiss, we assume the truth of the facts as alleged in the plaintiff's pleadings and construe all reasonable inferences in the light most favorable to the plaintiff.[1] Beane, 160

---

[1] Citing Howard v. Antilla, 294 F.3d 244, 249 (1st Cir. 2002), Union Leader argues that because this case raises First Amendment considerations, we may "deviate from the ordinary standard of review in considering a Motion to Dismiss, and consider facts outside of the four

N.H. at 711.  The standard of review when considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery.  Id.  This threshold inquiry involves testing the facts alleged in the pleadings against the applicable law.  Id.  The trial court may also consider documents attached to the plaintiff's pleadings, or documents whose authenticity no party disputes, official public records, or documents sufficiently referred to in the complaint.  Id.  We will uphold the granting of the motion to dismiss if the facts pled do not constitute a basis for legal relief.  Id.

III

[¶10] The plaintiff argues that the trial court erred in concluding that the second, fourth, and fifth statements quoted above are not defamatory.  In support of this position, he asserts: (1) the term "white supremacist" has an accepted meaning capable of being proved demonstrably true or false; (2) the challenged statements imply undisclosed defamatory facts; and (3) calling the writing an "op-ed" does not render it "judgment-proof."  We construe each of these arguments as a challenge to the trial court's overall conclusion that the op-ed as a whole constituted non-actionable opinion.

[¶11] We note that this case arises from the publication of an op-ed piece addressing, inter alia, issues related to Critical Race Theory, systemic racism, and proposed legislation then pending before the New Hampshire legislature.  As we have recently explained, discussion of public issues is "integral to the operation of the system of government established by our Constitution."  Hynes v. N.H. Democratic Party, 175 N.H. 781, 785 (2023) (quotation omitted).  The United States Supreme Court has expressed "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  Rosenblatt v. Baer, 383 U.S. 75, 85 (1966) (quotation omitted).  "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  Snyder v. Phelps, 562 U.S. 443, 452 (2011) (quotation omitted).  "The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  Hynes, 175 N.H. at 785 (quotation and brackets omitted).  Thus, "in public debate we must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment."  Snyder, 562 U.S. at 458 (quotation and brackets omitted).  It is against this backdrop that we consider the challenged statements.

---

corners of the Complaint." Because we affirm the trial court's decision using our established standard of review, we need not today decide whether to adopt a different review standard for cases raising First Amendment considerations.

[¶12] For a cause of action in defamation to survive a motion to dismiss, the plaintiff must have alleged facts that would show that the defendants failed to exercise reasonable care in publishing false and defamatory statements of fact about the plaintiff to a third party. See Automated Transactions v. Am. Bankers Ass'n, 172 N.H. 528, 532 (2019). Embedded in this recitation is the requirement that the challenged statement be one "of fact." Id. Conversely, a statement of opinion is not actionable unless it may reasonably be understood to imply the existence of defamatory facts as the basis for the opinion. Id. A further corollary of defamation law's factual requirement is that statements of "imaginative expression" or "rhetorical hyperbole" are not actionable because they cannot reasonably be interpreted as factual assertions. Id. at 533, 534. Whether a given statement can be read as being or implying an actionable statement of fact is a question of law to be determined by the trial court in the first instance. Id. at 533. Words alleged to be defamatory must be read in the context of the publication taken as a whole. Id.

[¶13] An important criterion for distinguishing statements of opinion from statements of fact is verifiability — i.e., whether the statement is capable of being proven true or false. Id. "Where an expressive phrase, though pejorative and unflattering, cannot be objectively verified, it belongs squarely in the category of protected opinion." Id. (quotation omitted). The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be verifiable and hence actionable. Id. at 533-34.

[¶14] Although we have not had cause to consider whether characterizations like the terms "racist" or "white supremacist" can be considered actionable under a theory of defamation, numerous other jurisdictions have considered the question. See, e.g., Law Offices of David Freydin, P.C. v. Chamara, 24 F.4th 1122, 1131 (7th Cir. 2022); La Liberte v. Reid, 966 F.3d 79, 93 (2d Cir. 2020); Overhill Farms, Inc. v. Lopez, 190 Cal. App. 4th 1248, 1261-62 (2010); Olthaus v. Niesen, 232 N.E.3d 932, 940 (Ohio Ct. App. 2023). The Ohio Court of Appeals recently concluded that the term "white supremacist" lacks precise meaning, and is an "inherently value-laden" label that conjures "a vast array of highly emotional responses that will vary from reader to reader." Olthaus, 232 N.E.3d at 940 (quotation omitted). The court explained that "because labels like 'white supremacist' lack a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." Id. (quotation and brackets omitted). The United States Court of Appeals for the Second Circuit, applying California tort law, has held that "accusations of concrete, wrongful conduct are actionable while general statements charging a person with being racist, unfair, or unjust are not." La Liberte, 966 F.3d at 93 (quotations and brackets omitted). Likewise, the United States Court of Appeals for the Seventh Circuit, applying Illinois defamation law, has held that the statement "racist" is actionable "when based on identifiable conduct but [is] non-actionable when stated in general terms." Law Offices of David Freydin, P.C., 24 F.4th at 1131. So too has the United

8

States Court of Appeals for the Third Circuit held that "derogatory characterizations without more are not defamatory," concluding that "a simple accusation of racism is not enough." McCafferty v. Newsweek Media Group, Ltd., 955 F.3d 352, 358 (3d Cir. 2020) (quotation omitted).

[¶15] We find the reasoning of these cases persuasive. See, e.g., Stevens v. Tillman, 855 F.2d 394, 402 (7th Cir. 1988) (the derogatory characterization of the plaintiff as a "racist" was non-actionable because it did not "impl[y] the existence of undisclosed, defamatory facts"); Automated Transactions, 172 N.H. at 534 ("an opinion . . . is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion" (quotation omitted)). Reading the op-ed as a whole, we agree with the trial court that the op-ed merely expressed the author's political opinions and beliefs that he individually held about the plaintiff and others not based on any undisclosed defamatory facts.

[¶16] The first allegedly defamatory statement identified by the plaintiff (statement 2) cannot be read in isolation, but rather must be read within the context of the paragraph in which it appears. See Automated Transactions, 172 N.H. at 533 ("Words alleged to be defamatory must be read in the context of the publication taken as a whole."). The paragraph reads in its entirety:

> Desperate to stay bonded to America's original sins of slavery and genocide of indigenous peoples, Gingrich, Frank Edelblut, Dan Richards, Mike Moffett, Joseph Mendola, and others have disseminated, across multiple media platforms, white supremacist ideology to keep Americans from learning an unexpurgated American history from its 1619 origins alongside the dominant White 1776 narrative.

When read in context, the language used is unquestionably "imaginative expression." See id. at 534. As the trial court pointed out, no rational finder of fact could read this paragraph and conclude that the author was claiming that the plaintiff "has engaged in the act of enslaving people" or that the plaintiff was desirous of committing genocide. Rather, as the trial court aptly observed, the author "made an 'imaginative expression,' which, although unflattering, reflects what Azzi believes the plaintiff desires." In addition, it is clear from the context in which it is contained that the phrase "disseminated . . . white supremacist ideology" falls into the realm of non-actionable derogatory characterization. See Stevens, 855 F.2d at 402. Nothing within this paragraph or the greater context of the op-ed states or implies that the plaintiff has engaged in "concrete, wrongful conduct." La Liberte, 966 F.3d at 93. Rather, the paragraph speaks generally about ideology the author considers to be "white supremacist" — ideology which the author believes the plaintiff supports. As the trial court points out, such a characterization "cannot be objectively verified . . . because whether a statement espouses white

9

supremacist ideology is a matter of socio-political opinion that differs between individuals." Cf. Olthaus, 232 N.E.3d at 940 ("because labels like 'white supremacist' lack a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content" (quotation and brackets omitted)).

[¶17] Thus, we agree with the trial court that language contained within this paragraph is merely expressive rhetoric meant to convey the author's opinion of the plaintiff's political views and is not designed to assert factual allegations related to the plaintiff's conduct. For these reasons, we conclude that the trial court did not err in concluding that this challenged statement constituted non-actionable opinion. See Automated Transactions, 172 N.H. at 533.

[¶18] Likewise, the other two statements the plaintiff challenges (statements 4 and 5) cannot be read in isolation. The paragraph in which the challenged statements appear states:

> Those who favor whitewashing history — favor suppressing the grievances and rights of Americans unlike themselves — favor suppressing the franchise of citizens who don't look like them — have shown they'll lie, go to any lengths, propose any laws, to protect their privilege and power over others. Most repugnant are those who distort, decontextualize, and misrepresent truth-tellers like MLK and Kendi when they talk about race and oppression.

(Emphases added.) We will assume, as the trial court ruled, that the implication of the challenged statements, which are emphasized above, is directed at the plaintiff as a member of the group identified at the beginning of the op-ed. However, when read as a whole, the general tenor of the rhetoric in the paragraph, and the challenged language especially, is hyperbolic and, therefore, does not create the implication that the author is stating actual facts. Id. (explaining that statements of "rhetorical hyperbole" are not actionable because they cannot reasonably be interpreted as factual assertions). This language does not accuse the plaintiff of actual conduct — for example, as the trial court noted, it does not claim that the plaintiff prevented anyone from voting or personally lied to "protect his supposed privilege and power." Rather, the author merely expresses his opinion of the behavior of all people who hold this purported ideology and projects it onto those who, like the plaintiff, supported HB 544. As the trial court concluded, "the statements are what Azzi claims to be attributes of a group that 'favor[s] whitewashing history.'" At its core, as the trial court noted, this rhetoric expresses the author's "socio-political opinion and cannot be verified." Accordingly, we conclude that the language falls within the realm of non-actionable opinion and, therefore, the trial court did not err. See id.

10

[¶19] The plaintiff next asserts that the trial court erred in concluding that "none of the challenged statements imply undisclosed defamatory facts." Although the plaintiff argues that a statement of "opinion" is actionable if it may reasonably be understood to imply the existence of defamatory facts as the basis for the opinion, as explained above, we agree with the trial court that the challenged rhetorical language does not imply the existence of any non-disclosed defamatory facts. Moreover, the author explains that his opinion derives from the plaintiff's support of HB 544, a fact which the plaintiff does not dispute. Thus, while the op-ed does not imply the existence of undisclosed defamatory facts, it also states the factual basis on which it relies. Therefore, we conclude that the trial court did not err.

[¶20] Lastly, the plaintiff asserts that the trial court erred in ruling "that because the Union Leader published Azzi's column in its 'op-ed' section, everything in the article is simply Azzi's opinion of the plaintiff and others identified in the op-ed." (Quotation omitted.) As an initial matter, we note that the trial court did not rule that because the writing appeared in the newspaper's op-ed section that everything that followed was clearly opinion. Rather, within its order, the trial court opined that it "is significant that Azzi's column is published in the 'Op-Ed' section of the Union Leader," because it "signal[s] to readers that this is Azzi's opinion of the plaintiff and others identified in the op-ed." We agree. "Although the appearance of the column on the op-ed page, without more, is not at all dispositive, it is nevertheless some indication that the statements made in the column are opinions." Aldoupolis v. Globe Newspaper Co., 500 N.E.2d 794, 797 (Mass. 1986). "[R]eaders of the op-ed page no doubt expect to read columnists' views and opinions as opposed to factual news stories." Id. Further, as explained above, the trial court carefully analyzed the challenged statements within the context of the op-ed itself, and we find no error in its analysis.

[¶21] We next consider the plaintiff's contention that the trial court erred in dismissing his claim for invasion of privacy — false light. As the trial court correctly stated, we have never recognized the tort of invasion of privacy — false light. Rather, when the issue has arisen in the past, we have declined to address it. See, e.g., Hynes, 175 N.H. at 792; Thomas v. Telegraph Publ'g Co., 151 N.H. 435, 440 (2004); see also Mansfield v. Arsenault, No. 2020-0100 (non-precedential order), 2021 WL 72370 (N.H. Jan. 8, 2021). Because the issue is presented and briefed in this case, we will consider it now.

[¶22] Whether to recognize a new cause of action presents a question of policy — would it be wise to provide the relief that the plaintiff seeks? See Numerica Savings Bank v. Mountain Lodge Inn, 134 N.H. 505, 509 (1991). Reaching an answer to this question requires two separate steps, for we must determine whether the interest that the plaintiff asserts should receive any legal recognition and, if so, whether the relief that the plaintiff requests would be an appropriate way to recognize it. Id.

11

[¶23] The plaintiff argues that we should recognize the cause of action for false light invasion of privacy as set forth in the Restatement (Second) of Torts:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977).

[¶24] We begin by noting that we have long recognized a right of privacy in this state. See Hamberger v. Eastman, 106 N.H. 107 (1964). It is the scope of that right that is here at issue. In Hamberger, we explained that invasion of the right of privacy consists of four distinct torts: "The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be let alone." Id. at 110 (quotation omitted). "The four kinds of invasion comprising the law of privacy include: (1) intrusion upon the plaintiff's physical and mental solitude or seclusion; (2) public disclosure of private facts; (3) publicity which places the plaintiff in a false light in the public eye; [and] (4) appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness." Id.

[¶25] We have recognized three of these privacy-related torts. See id. at 112 (recognizing tort for invasion of plaintiff's solitude or seclusion); Karch v. BayBank FSB, 147 N.H. 525, 534-35 (2002) (recognizing tort for public disclosure of private facts); Remsburg v. Docusearch, 149 N.H. 148, 157 (2003) (recognizing tort for appropriation of plaintiff's name or likeness). Here, however, even accepting that the interest that the plaintiff asserts — protection against publicity which places a plaintiff in a false light in the public eye — should receive legal recognition, we conclude that the relief the plaintiff requests would be neither an appropriate nor necessary way to recognize it.

[¶26] It is true that a number of jurisdictions have recognized the tort of false light invasion of privacy as set forth in the Restatement (Second) of Torts. We find persuasive, however, the Florida Supreme Court's analysis, declining to recognize the tort, in Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1114 (Fla. 2008). The tort is largely duplicative of existing causes of action, particularly defamation, both in the conduct alleged and the interests

12

protected. While it is often argued that the tort of false light invasion of privacy allows recovery for "literally true statements that create a false impression," Rapp, 997 So. 2d at 1106, the tort of defamation already recognizes that concept. See Martin v. Hearst Corp., 777 F.3d 546, 552 (2d Cir. 2015) (noting that even a technically true statement can carry a defamatory meaning by implication) (cited in Hynes, 175 N.H. at 789). We see no reason to recognize a cause of action for false light invasion of privacy when recovery for that tort is substantially duplicated by torts already established in this state.

[¶27] We find support for our conclusion in a 1992 law review article in which the author, Professor J. Clark Kelso, reviewed over 600 cases mentioning false light privacy by name. Professor Kelso noted that "[w]ith over six hundred cases mentioning false light privacy by name, one would expect to find at least one or two opinions in which false light was actually necessary to a proper decision." J. Clark Kelso, False Light Privacy: A Requiem, 32 Santa Clara L. Rev. 783, 785 (1992). Professor Kelso concluded, however, that there was not "a single good case in which false light can be clearly identified as adding anything distinctive to the law. In the overwhelming majority of cases, false light is simply added on at the end of the complaint to give the complaint the appearance of greater weight and importance." Id.

[¶28] Accordingly, we join those jurisdictions that, like Florida, have declined to recognize a common law false light invasion of privacy action. See, e.g., Renwick v. News and Observer Pub. Co., 312 S.E.2d 405, 413 (N.C. 1984); Cain v. Hearst Corp., 878 S.W.2d 577, 579 (Tex. 1994). As we noted above, whether to recognize a new cause of action presents a question of policy. Although we have the power to recognize a new common law cause of action, we are mindful that we should make such changes sparingly. See Aranson v. Schroeder, 140 N.H. 359, 365 (1995). Matters of public policy are primarily matters for the legislature, not the court, see Zannini v. Phenix Mut. Fire Ins. Co., 172 N.H. 730, 734 (2019), and we conclude that if a false light invasion of privacy cause of action is to be recognized in this jurisdiction, it should be crafted by the legislature, not the court. Cf. R.I. Stat. Ann. § 9-1-28.1(a)(4) (2012) (providing a "right to be secure from publicity that reasonably places another in a false light before the public").

[¶29] In light of our rulings above, we need not consider Union Leader's cross-appeal. We affirm the trial court's dismissal of the plaintiff's complaint.

Affirmed.

MACDONALD, C.J., and DONOVAN, J., concurred; COUNTWAY, J., concurred in part and dissented in part; HICKS, J., sat for oral argument but did not participate in the final vote, see N.H. CONST. pt. II, art. 78; HANTZ MARCONI, J., sat for oral argument but did not participate in the final vote.

13

COUNTWAY, J., concurring in part and dissenting in part.

[¶30] I agree with the majority's analytical approach and conclusions regarding false light and agree with its conclusion that the statement "[t]hose who . . . favor suppressing the franchise of citizens who don't look like them— have shown they'll lie" is not actionable in defamation. I disagree, however, that the statement identifying the plaintiff by name and asserting that he has "disseminated, across multiple media platforms, white supremacist ideology" is necessarily non-defamatory. In my view, the majority's analysis places too much emphasis on the general context of the statement, and does not sufficiently consider the specific language used and whether it states or implies the existence of facts that could be proven true or false.

[¶31] Not every statement that might be labeled "opinion" is categorically exempt under federal constitutional law from being actionable in defamation. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990). Rather, the question is whether the statement at issue "present[s] or impl[ies] the existence of facts that can be proven true or false." Gray v. St. Martin's Press, 221 F.3d 243, 248 (1st Cir. 2000) (citing Milkovich, 497 U.S. at 18-20). In Automated Transactions v. American Bankers Ass'n, 172 N.H. 528, 532 n.2 (2019), we recognized that this is also the appropriate inquiry under New Hampshire common law. The majority asserts that the phrase "'disseminated . . . white supremacist ideology' falls into the realm of non-actionable derogatory characterization," and that "nothing within this paragraph or the greater context of the op-ed states or implies that the plaintiff has engaged in 'concrete, wrongful conduct.'" I disagree, because I would distinguish a statement accusing someone of being a white supremacist, see Olthaus v. Niesen, 232 N.E.3d 932, 940 (Ohio 2023) (noting that the plaintiff made no argument "for how someone would plausibly go about proving or disproving one's white supremacist bona fides"), from the statement at issue here. In the present case, it would be possible to examine the information that, according to Azzi, the plaintiff has disseminated over multiple media platforms to determine whether it contains white supremacist ideology.

[¶32] In concluding that the statement is "rhetorical" and "does not imply the existence of any non-disclosed defamatory facts," the majority states that "the author explains that his opinion derives from the plaintiff's support of HB 544, a fact which the plaintiff does not dispute." The majority evidently concludes that defendant Azzi's statement that the plaintiff disseminated white supremacist ideology was a statement of Azzi's opinion that by supporting HB 544 and opposing the teaching of critical race theory, the plaintiff disseminated white supremacist ideology. Were it clear on the face of the article that this was the factual basis of defendant Azzi's assertion, I would agree that the statement would not be actionable. In such a case the reader would have had the opportunity to assess the basis on which the statement was founded, allowing the reader to draw his or her own conclusions concerning the

14

opinion's validity.  See Davis v. Boeheim, 22 N.E.3d 999, 1004 (N.Y. 2014); Automated Transactions, 172 N.H. at 534 ("[E]ven a provably false statement is not actionable . . . when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts." (quotation omitted)).  But the article does not make that clear. While defendant Azzi asserts that the article, in electronic form, links to columns and articles written by others named in the opinion piece, specifically, Gingrich, Edelblut, and Mendoza, the defendants do not contend that the article contains links to the plaintiff's statements, writings or actions. Accordingly, it is not clear what facts defendant Azzi relies upon to support his assertion that the plaintiff disseminated white supremacist ideology.

[¶33] In light of the foregoing, I would reverse and remand the case for further proceedings, including a determination of whether the plaintiff is a public figure, in which case he would be required to prove, not only that the stated or implied assertions of fact are false, but also that the statement was made with actual malice.  New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); Nash v. Keene Publishing Corp., 127 N.H. 214, 222 (1985).  These further proceedings would not undermine the strong societal interest in robust discussion of public issues, but would better balance that interest with the plaintiff's reputational interests and his right to the protection of his own good name, honoring "the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 341 (1974) (quotation omitted); see also New York Times Co., 376 U.S. at 269-70 (identifying the constitutional safeguards for freedom of expression on public questions).